Argued March 6, reversed April 15; rehearing denied May 27, 1930

BROWN *v.* HILLEARY ET UX.

(286 P. 593)

*T. J. Cleeton* of Portland (James H. McMenamin of Portland on the brief) for appellant.

*A. G. Beattie* of Oregon City (Schuebel, Beattie & Miller of Oregon City on the brief) for respondents.

RAND, J. This is a suit in equity brought by plaintiff, a sister of defendant, John W. Hilleary, to set aside a deed alleged to have been procured by undue influence. The deed was executed by their mother, Louisa A. Hilleary, on June 9, 1923, the next following day after his discharge as guardian of his mother's estate, and purported to convey to defendants 46.02 acres of land in Clackamas county for the expressed consideration of $10. The grantor at the time was the widow

of Henry Hilleary, deceased, the father of plaintiff and defendant, John W. Hilleary, and the grantor has since died.

■■ The first contention made by defendants, who are the respondents here, is that, since the grantor left a will naming the defendant, John W. Hilleary, as executor and he has not been removed, plaintiff cannot maintain the suit. This contention was first raised by a demurrer to the complaint which was overruled in the lower court and has been renewed upon the argument here. Plaintiff and her brother were the children of Henry and Louisa A. Hilleary and, upon the death of their mother, they were her sole heirs at law and, if no deed or will had been made, plaintiff, as heir of the mother, would have succeeded to an undivided one-half interest in the property. It is a rule of general application that a deed procured by the exercise of undue influence upon the grantor may be set aside upon a proper and timely application by the person or persons aggrieved. See 18 C. J., p. 236, § 163. As said in *Warner v. Flack,* 278 Ill. 303 (116 N. E. 197, 2 A. L. R. 423):

"The law is that where a deed or other conveyance has been procured by undue influence, if it be not ratified by the party making it after the undue influence has ceased to operate, it may be set aside after his death, at the suit of those who succeed to his rights."

See authorities there cited. Also, see annotation following the principal case in 2 A. L. R., p. 431; also, *Warren v. Fed. Land Bank of Columbia,* 157 Ga. 464 (122 S. E. 40, 33 A. L. R. 45). In 3 Thompson on Real Property, § 2875, the author says:

"Undue influence means wrongful influence. The influence which will render a conveyance voidable is of such a nature as to deprive the grantor of his free

agency. If the influence, however exerted, has the effect to control the grantor's volition and to induce him to do what he otherwise would not have done, it is undue or wrongful, and may be taken advantage of by the grantor himself, or by others injuriously affected, to have the deed set aside.''

■ Under the common law most. personal actions were held to abate but this rule has been so far changed in this state by statute that most causes of action now survive, including all actions for fraud or deceit: Or. L., § 379. The common-law rule, however, had no application to cases of equitable cognizance, for remedies administered in equity do not die with the person: *Warner v. Flack,* supra.

Under the allegations of the complaint and the proof offered upon the trial, if plaintiff were compelled to await the bringing of a suit by the executor to set aside this deed, she would be remediless for, he being the one who committed the wrong, he would, of course, take no steps to undo it. The fact, however, that he is the executor of his mother's will will not relieve him from answering for his wrong when sued by his aggrieved sister. We are not unmindful of the decision in *Sappingfield v. Sappingfield,* 67 Or. 156 (135 P. 333), where it was held that the subsequent making of a will by the grantor from whom the deed had been procured by undue influence, devising the same property to the grantee, would operate as a ratification of what might otherwise have been an invalid deed and bar the bringing of a suit to set aside the deed, but in that suit the will was presumptively valid, while in the instant case the will devising the property to defendants was made before the deed was executed and while the relation of guardian and ward existed, as will be later shown, between defendant and his mother. Hence, that

decision is not applicable under the facts as they exist in this case. Although the validity of that will can not be questioned in this suit, nevertheless a contest proceeding against the will is pending in the probate court of that county. If both the deed and will are invalid, as contended for, the fact that plaintiff must commence separate proceedings before different tribunals to obtain an adjudication of her rights will not operate to prevent her from doing so.

■ Another point raised by the demurrer and argued here is that the complaint failed to state that defendants were the owners of the property at the time the suit was commenced. There were allegations in the complaint sufficient, we think, to sustain it upon that question but whether so or not, the defendant's own answer specifically alleged that defendants are the owners of the property. If the complaint was defective in that particular, defendants' answer cured the defect under the rule announced in *Catlin v. Jones,* 48 Or. 158, (85 P. 515), that where an essential fact has been omitted from the complaint and the defendant, in his answer, sets up and alleges the existence of such fact, the defect is cured. To the same effect see *Hodson-Feenaughty Co. v. Coast Culvert & Flume Co.,* 91 Or. 630 (178 P. 382, 179 P. 560) : *Lauderback v. Multnomah County,* 111 Or. 681 (226 P. 697).

■■ Having thus disposed of the objections urged against the legal sufficiency of the complaint, we will now take up and discuss the evidence offered by plaintiff in support of her right to maintain the suit. It appears from her testimony and that of her witnesses that plaintiff's father died in September, 1918, leaving an estate consisting of the land in question, another small tract of land, and about six or seven thousand

dollars in money, notes and mortgages; that, except for two small legacies—one to plaintiff, the other to defendant—he devised all his property to plaintiff's mother; that prior to his death he requested his wife, upon her death, to leave a will devising all the property that then remained to his daughter and assigned as his reason therefor that he had already advanced to his son various sums of money in excess of the value of the property he then owned. The evidence shows that he made this statement not only to his wife but to others; that, in conformity to her husband's request, the mother offered to deed the real property to plaintiff and to make a will bequeathing her other property to plaintiff; that plaintiff refused to accept her mother's offer and persuaded her to devise her property equally between plaintiff and her brother. This testimony is corroborated by the testimony of Mr. T. J. Cleeton, a reputable attorney, who testified that in 1920 or 1921 (he was not sure of the date), plaintiff and her mother came to his office to consult him and the mother did the talking:

"She said she wanted to give it to Pearl. She wanted Pearl to have this farm. And she wanted to deed it to her and she, Pearl, stated she didn't want her mother to deed her the farm. She said she didn't want any family disturbance because she knew her brother would be very much incensed about it and raise a row if her mother deeded to her the farm, and she didn't want it that way; that she wanted the affairs to be settled up and wanted no family fuss and she would not accept a deed."

Plaintiff, however, did request her mother to convey to plaintiff and her husband twenty acres of the land for which plaintiff promised to pay $6,000. The deed for the twenty acres was made, $500 of the pur-

chase price was paid and a mortgage on the land in favor of the mother for the balance of the purchase price, payable in installments, was executed and delivered. The evidence also shows that, at her daughter's request, the mother went with plaintiff to the office of Grant B. Dimick at Oregon City, where a will was prepared and executed, devising the property in equal shares to the two children. It also appears from the evidence that after her father died plaintiff and her mother and brother went to Dimick's office to hear the will of the father read; that Dimick then stated to the three present that the father wanted the property, upon his wife's death, to go to his daughter and not to his son because of the advances he had already made to his son, and that the son then stated "he would not stand for that; he would have his share and have it right now."

The mother's will to which we have referred, dividing the property between the two children, was dated June 26, 1919, and the deed from the mother to the daughter for the twenty acres of land was dated March 23, 1920.

It also appears that Grant B. Dimick was an attorney at law practicing at Oregon City; that he had been the legal adviser of plaintiff's father and, after his death, of her mother, and subsequently he became the legal adviser of her brother; that plaintiff's father, during his lifetime, had intrusted Dimick with $5,000 in money, and that, upon the father's death, plaintiff's mother was anxious to collect this money; that plaintiff attempted to assist her in making the collection; that they consulted Cleeton for that purpose. It also appears that Dimick never paid said sum or any part thereof, unless he paid it to the son and, if paid to the son, it was never received by the mother. Subsequently

Dimick became a defaulter of large sums of money which had been intrusted to him by others and is now a fugitive from justice. Because of plaintiff's actions in attempting to assist her mother in the collection of this money, the evidence shows that Dimick became very much incensed against plaintiff and conspired with her brother to defraud both plaintiff and her mother and to assist the son in getting control of all his mother's property, which defendant succeeded in doing.

Prior to the acts complained of, plaintiff and her husband resided in the state of Washington, her brother resided at Sisters, a point in Eastern Oregon where he and his wife were operating a dairy farm, and the mother was residing upon her own property in Clackamas county. After plaintiff received the deed from her mother for the twenty acres of land, she and her husband, who is now dead, built a house thereon and went there to live. While living there plaintiff's husband met with a serious accident which compelled plaintiff to abandon her residence upon the twenty acres and take her husband to Portland. Because of this she became unable to meet the payments falling due under her mortgage and her mother gave her a written extension of time.

While plaintiff was so absent and without any notice to her, her brother, on June 9, 1921, filed a petition in the county court for Clackamas county, praying for his appointment as guardian of the estate of his mother. Dimick acted as attorney for him in the matter. His petition was accompanied by what purports to be a like petition signed by his mother asking for his appointment. His petition recites that the mother was then seventy-seven years of age and states that she was not physically able to look after her own affairs

and that she "is being imposed on by other persons to her financial injury and said Louisa A. Hilleary (is) at present under the care of neighbors and your petitioner." On the same day defendant filed a bond and was appointed guardian of his mother's estate and immediately thereafter he, as guardian of his mother's estate, commenced suit against his sister to foreclose the mortgage given the mother by plaintiff and in that suit secured a decree foreclosing the mortgage and had the property sold, bidding it in as guardian of his mother's estate. Defendant continued as guardian of his mother's estate until June 8, 1923, when he was discharged upon his own application. While so acting as guardian and on February 28, 1923, the evidence shows that a will was prepared by Dimick which purports to have been executed by the mother in which all the mother's property was devised to the son. It recited that plaintiff owed $1,900 to the mother and directed that if she paid that sum, then she should receive from her mother's estate the sum of $300, and if she failed to pay, then she was to receive nothing under the will. On June 9, 1923, on the day following defendant's discharge as guardian of his mother's estate, a deed was prepared which purports to have been executed by the mother and which conveyed all her real property to the defendants. The consideration named in the deed is $10. This is the deed which plaintiff seeks to have set aside in this suit.

From the time plaintiff left her home on the twenty-acre tract, which had been conveyed by the mother to plaintiff, as aforesaid, in order to take her sick husband to Portland, plaintiff never saw her mother again. She went to her mother's home but found that her brother had taken her mother away and she was unable to ascertain where her mother was. She afterwards learned

that her mother had been taken to Sisters, where defendants were operating their dairy farm. How long they remained there is not shown by the evidence but eventually they returned to the farm in Clackamas county, where they remained until the mother's death in 1928. Plaintiff's testimony shows that the defendant, John W. Hilleary, is very quarrelsome, has a violent temper, had threatened to kill plaintiff's husband, and that plaintiff was in great fear of him; that he notified plaintiff that she could not come on the place where her mother was and that because of his threats and her fear of him, she never visited her mother after her mother's return to the farm. The whole evidence shows that the relations between the mother and daughter were always friendly and intimate and that there was a strong mutual love and affection between them. Mrs. Marie Seaman, a neighbor and apparently a disinterested witness, testified:

"I know her mother was very fond of her and I have never seen her but what she said: 'Have you seen my poor Pearl? Do you know where she is?' I did know where she was, but I thought it was not best to tell her, I didn't feel that she was able to go to her. She said if she knew where she was she would go to her. I talked to John Hilleary's wife and she said they had gotten a letter and they had heard where Pearl was but they didn't think it was best to tell her mother because the mother said she would go to her if she knew where she was. Q. This was a short time before the mother's death. A. Yes. And Mrs. Brown called me up about a week before her mother died and told me: 'If you hear that mother is sick you let me know and I will go to see her.' Q. What did you tell Pearl? A. Well, I said she was well. I had just seen her a short time before and I said she was apparently very well, and she said: 'If she gets sick let me know.' And I said: 'I will if I know it.' She said: 'You will know it because they will

let you know if she gets sick.' But I didn't know until after she was dead that she was sick. * * *. Q. Did you have any discussion with John's wife with relation to Pearl going out to see the mother? A. Yes. Q. What did Mrs. John Hilleary say to you, if anything? A. Well, I was talking to her about her, and also the old lady was anxious to hear from Pearl. I talked to Katie— Q. Who is Katie? A. She is the wife of the defendant. Q. The wife of John Hilleary, the defendant? A. Yes, sir. My sister and I was out to see her and she said: 'I know where she is, but she don't know how to get there. I think she knows where she is, but she don't know how to get there and if I were you I would not say anything because she is very determined and she would go there if she had to walk, if she knew where she was.' Q. Did Mrs. John Hilleary say anything about Pearl not going out to where the mother was? A. No, sir, she didn't say anything about Pearl going, or anything about Pearl. Q. In what feeling of esteem, if you know, did Pearl hold her mother in? A. Very dear for anything I know. Q. Do you or do you not know whether they were very companionable. A. I think so. It always seemed so to me whenever I was around."

Mrs. Ledene LeBenz, another apparently entirely disinterested neighbor, testified:

"Do you remember the time she died? A. Oh, yes. Q. How long sick before she died? A. Oh, she don't feel very good at the time she come up there. Q. When she come your house she talked about Pearl? A. Oh, she said she was going to pick berries and go find Pearl. Q. What pick berries for? A. Cause she wants to go find Pearl. Q. What was she picking berries for? Did she want to sell them? A. No, she wants to pick berries and earn money to go find Pearl. Q. Why did she want money to see Pearl? Did she have money of her own? A. I don't know. Q. Did she talk about Pearl when she wished she know where Pearl was."

As stated the defendant was appointed guardian of the estate of his mother on June 9, 1921, and was discharged on June 8, 1923. He rendered a statement of the moneys received and disbursed by him as guardian. This statement shows that he received in all $297.25 and disbursed $278.93, leaving a balance unexpended at the time of his discharge of $18.32. There is no reference anywhere in the records of the guardianship proceedings of any moneys paid by Dimick. If they were paid, as contended upon the argument here, they were received and unacounted for by defendant.

At the close of plaintiff's case in chief, defendant was called and sworn and then withdrawn before giving any testimony whatsoever, and no witness was called to testify or did testify in his behalf. Plaintiff's testimony is wholly unexplained and uncontradicted. The reason assigned for defendant's failure to offer evidence in the case is the contention that, upon the grounds already stated and disposed of, the complaint did not state facts sufficient to constitute a cause of suit. There is nothing improbable or unreasonable in the testimony offered by plaintiff and her witnesses and, since it stands uncontradicted and unexplained, we are bound to give it the weight to which it is entitled. Under this testimony, plaintiff's mother was seventy-seven years of age at the time the son was appointed as guardian of her estate and took charge of her person and control of her property. Plaintiff, her daughter, was wilfully kept in ignorance of her mother's whereabouts and, upon her mother's return, plaintiff was prevented by defendant's threats and by fear from visiting her mother or communicating with her at any time up to the time of her mother's death. Without consultation with his sister, defendant stripped his mother of all her

property and took and maintained absolute control over his mother's property, had himself appointed as guardian of her estate and, when called upon to explain his conduct, he offers no explanation and makes no denial. As said in 2 Pomeroy's Equity Jurisprudence, (4th Ed.) section 961:

■ "The equitable rules concerning dealings between guardian and ward are very stringent. The relation is so intimate, the dependence so complete, the influence so great, that any transactions between the two parties, or by the guardian alone, through which the guardian obtains a benefit, entered into while the relation exists, are in the highest degree suspicious; the presumption against them is so strong that it is hardly possible for them to be sustained. * * * The general doctrine of equity applies to the parties after the legal condition of guardianship has ended, and as long as the dependence on one side and influence on the other presumptively or in fact continue. This influence is presumed to last while the guardian's functions are to any extent still performed, while the property is still at all under his control, and until the accounts have been finally settled. It follows, therefore, that any conveyance, purchase, sale, contract, and especially gift, by which the guardian derives a benefit, made after the termination of the legal relation, but while the influence lasts, is presumed to be invalid and voidable. The burden rests heavily upon the guardian to prove all the circumstances of knowledge, free consent, good faith, absence of influence, which alone can overcome the presumption."

The same rule is announced in Story's Equity Jurisprudence, (2d Ed.), § 317, where it is said:

"In this most important and delicate of trusts the same principles prevail, and with a larger and more comprehensive efficiency. It is obvious that, during the existence of the guardianship, the transactions of the guardian cannot be binding upon the ward if they

are of any disadvantage to him; and indeed, the relative situation of the parties imposed a general inability to deal with each other. But courts of equity proceed yet further in cases of this sort. They will not permit transactions between guardians and wards to stand, even when they have occurred after the minority has ceased and the relation become thereby actually ended, if the intermediate period be short, unless the circumstances demonstrate, in the highest sense of the term, the fullest deliberation on the part of the ward, and the most abundant good faith (uberrima fides) on the part of the guardian. For in all such cases the relation is still considered as having an undue influence upon the mind of the ward, and as virtually subsisting, especially if all the duties attached to the situation have not ceased, as if the accounts between the parties have not been fully settled, or if the estate still remains in some sort under the control of the guardian.''

In *Daniel v. Tolon,* 53 Okla. 666 (157 P. 756, 4 A. L. R. 704), it is said:

''While equity does not deny the possibility of valid transactions between parties, where a fiduciary relationship exists, yet because every such relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively his compliance with equitable requisites, and of thereby overcoming the presumption. The broad principle on which the court acts in cases of this description is that wherever there exists such a confidence, of whatever character that confidence may be, as enables the person in whom confidence or trust is reposed to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with

the person so trusting him. Whenever two persons stand in such a relation that, while it continues, confidence is necesarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have. been impeached if no such confidential relation had existed.''

■ While no presumption arises merely from. the relationship of parent and child, or because of the great age of the grantor alone, that a deed was procured by undue influence, the authorities ''are uniform in holding that, where age is accompanied by mental and physical weakness, or the grantor is dependent upon or under the control of the grantee, the presumption is against the validity of the conveyance, particularly where it is without consideration or deprives the grantor of his entire, or substantially his entire, property.'' 18 C. J., § 504, p. 425. In the same section, it is said:

''The mere fact that the conveyance to a child operates to the exclusion of other children will not raise a presumption of invalidity, although it may be of great weight in connection with other circumstances.''

The consideration expressed in the deed was $10, a wholly inadequate consideration. The grantor, at the time of its execution, was seventy-nine years of age; she was dependent upon and under the control of her son; up to the day preceding its execution, he had been her guardian. Whether she ever knew that he had been discharged as such guardian the evidence does not disclose. By the execution of the deed she had deprived herself of substantially her entire property and the

deed operated to the exclusion of plaintiff, her daughter. These facts made it incumbent upon the defendants to go forward with the testimony and to show the validity of the transactions complained of. This defendants wholly failed to do.

The decree, therefore, will be reversed and a decree will be entered here, holding the deeds to be invalid and of no force or effect whatever but without prejudging or in any way determining the rights of either party under the will.

Coshow, C. J., and Rossman, J., concur.

McBride, J., did not participate in this opinion.