Argued September 13; modified October 17, 1944

# RAMSTEAD *v.* BRIDGES

(152 P. (2d) 306)

Before BAILEY, Chief Justice, and BELT, KELLY, BRAND and HAY, Associate Justices.

*Gordon A. Ramstead,* of Eugene (Reese Wingard and Gordon A. Ramstead, both of Eugene, on the brief), for appellant.

*H. E. Slattery,* of Eugene, for respondent.

. BELT, J.

This is a suit by the guardian of the person and estate of Clyde Hegarty, an insane person, to set aside and hold for naught (1) a deed purporting to convey to the defendant a lot in Eugene, Oregon, of the approximate value of $700; (2) transfer to defendant of a certificate of deposit in the Equitable Savings & Loan Association, having a cash surrender value of $1,884.80; and (3) the transfer of title to defendant of certain household furniture and carpenter tools. Plaintiff also sought to have defendant account (1) for rentals collected on the above mentioned real property and (2) for the sum of $400 alleged to have been withdrawn by Hegarty from his savings account in a bank at Eugene, Oregon, and to have come into the possession of the defendant. It is alleged that the above property was acquired by defendant through fraud, duress, and undue influence; and that Hegarty, at the time of making such disposition of his property, was mentally incompetent to transact business.

The circuit court found that no fraud, duress, or undue influence was practiced by defendant and that

Hegarty was mentally competent to dispose of his property. The decree sustained the validity of the deed and the transfer of the title to the furniture and the carpenter tools, but held that plaintiff, as guardian of the estate, was the owner of the certificate of deposit and the bank account above mentioned. The circuit court found that defendant made no claim to the bank account and that there was no misappropriation of funds entrusted to her by Hegarty. The appeal pertains principally to the conveyance of the real property, as the household furniture and carpenter tools are of little value.

Clyde Hegarty is a bachelor about 65 years of age and has an estate of the approximate value of $7,000.00. He lived for several years in a small, three-room house on the lot in question located a few blocks from the home of the defendant. In 1941, Hegarty suffered a slight stroke and his health became progressively worse. He walked in a shuffling manner, was subject to dizzy spells and, according to most of his neighbors, was looked upon as "peculiar". A short time before going to the Convalescent Home in June, 1943, Hegarty worked in a planing mill for about three weeks but was discharged as, since he was so forgetful and stumbled so easily, his employer considered it unsafe for him to be near machinery.

Hegarty's condition became worse. His sister, who resides at Portland, Oregon, came to Eugene and arranged to have her brother live at a convalescent home. He remained in such home from June 12, 1943, to July 13th of the same year. Mrs. Parren, who operated the convalescent home, was positive and convincing in her testimony that, during such period of time, Hegarty's mental condition was very bad and that he was in-

capable of transacting business. She told of Hegarty's becoming so unruly and violent—as well as drooling at the mouth and "passing out" completely—that she was obliged to have his sister take him away. Hegarty then went to Portland to live with his sister's daughter. While there he took excessive doses of medicine and became seriously ill. On July 28, 1943, he came back to Eugene and went to the home of the defendant, who is 85 years of age, requesting permission to live there "for a while", being willing to pay $50 a month for his board and room.

On August 7, 1943—nine days after coming to the home of the defendant—Hegarty signed the deed in question. A few days later he turned over to defendant the certificate of deposit and his bank book. The certificate of deposit, together with some other papers, were taken by defendant to Mr. H. E. Slattery in compliance with the request of Hegarty. It appears that Mr. Slattery had acted as his attorney in 1941 in preparing a contract for sale of a farm owned by Hegarty in Iowa. While Hegarty was living with the defendant, $400 was withdrawn from his bank account, $200 of such sum being given to the defendant for the purpose of paying his doctor bill. That defendant paid the doctor is undisputed. She also aided him in other instances by attending to some minor business affairs, such as paying his hospital bill.

Seven days after the deed was signed, Hegarty was admitted to the Sacred Heart hospital at Eugene for treatment of a prostatic obstruction. Dr. Charles Donahue, a witness for plaintiff, in testifying about the mental condition of his patient at that time, said:

"* * * As far as his mental condition is concerned, I didn't see anything particularly wrong,

other than what you would notice in senile changes for a man of his age, outside of his unsteady balance.''

However, on cross examination, the doctor, in response to the question, ''Didn't his mind appear normal for his age between those dates (June 2d and August 12th, 1943)?'' answered: ''As I said a moment ago, we considered him a little peculiar. Personally I made no professional examination as to his mental capacity. I do not consider myself an expert on these lines.'' In response to the question by the court, ''But he was definitely off at the time he was committed to the insane asylum, wasn't he?'' he answered, ''That's right. As a matter of fact he did not seem to know me or Dr. Waller. He did not seem to know anyone. He had a very vacant, wild stare out of his eyes.'' (By Mr. Slattery) ''Q. But from June 2nd to August 12 you did not notice any of these symptoms, did you? A. Well, not definite, not as definitely as we noticed when we committed him to the asylum. Other than being just a little odd, peculiar.''

On August 19, 1943, Hegarty was discharged from the hospital and, again, went to the home of the defendant. On the night of August 22, 1943, the defendant telephoned to Dr. Donahue and told him that Hegarty was threatening to kill her and for him to come up there and get him. Dr. Donahue, accompanied by a police officer, immediately complied with this request and removed Hegarty to the hospital. Hegarty admitted having two loaded guns at *his* home. Mrs. Bridges was greatly frightened and was crying. Dr. Donahue was definitely of the opinion that, at this time, Hegarty was insane. A few days later an operation was performed on Hegarty to relieve him of his urinary

disturbance. On September 22, 1943, he was declared insane and committed to the State Hospital for the Insane where he has remained ever since.

The defendant thus tells how Hegarty, with whom she had only a casual acquaintance, came to make the deed to her:

> "* * * I was sitting sewing on buttons on his underclothes, and he came out of his bedroom and walked up in front of me and asked what I was doing. I said, 'I am sewing some buttons on your clothes.' He said 'You are the first woman that ever sewed buttons on my clothes; I always sew my own buttons on and do my mending'. And he said, 'Would you like that little house that I have got?' 'Oh,' I said, 'It is a good house for a bachelor; it is a small house.' 'Well,' he says, 'I am going to give you that house and lot.' I said, 'What's that for?' 'Well, I want to stay here,' he says, 'until I go home to Iowa. I am going to my Mason's Home in Iowa, and I give you this house and lot,' he says, 'until I go and if I can stay here'. I said, 'Well, I guess you can stay if it ain't too long. * * * Then in a few days he wanted me to go down to Judge Slattery and have a deed made to the premises."

In another part of defendant's testimony, she said that Hegarty told her "I won't stay long, if you will let me stay I will pay you fifty dollars just the same as I paid at the Convalescent Home." She said, "Later on I told him he could stay, if he didn't stay too long."

Mrs. Frances Michael, a neighbor and friend of the defendant, testified, on cross examination, contrary to the theory of the defense, that, in a conversation with Hegarty on August 10, 1943, he said "he was giving it (his property) to Mrs. Bridges for his care."

"Q. Well, then, there was no gift in the thing at all. She was to take care of him. Is that the picture? A. That was the picture exactly."

The defendant, however, refused to go to Mr. Slattery whom Hegarty knew and trusted, and insisted upon having her lawyer, Miss Dorilla Sommers —a person whom Hegarty had never met—prepare the deed. Prior to making the deed, Hegarty requested Mrs. Bridges to take certain papers to "Judge Slattery, * * * because he is an honest old fellow; he made out all my papers for my land sale, and he is an honest old fellow." Mrs. Bridges states that she replied: "Well, * * * you have got to show me the first lawyer that is honest, I would like to see him." The defendant telephoned to Miss Sommers who came to her home and, after getting a general description of the property, later in the day drew the deed and brought it back for execution. Miss Sommers says that when she first came to the home of the defendant in response to the telephone call, the latter introduced her to Hegarty, stating that "he had a piece of property that he wanted to give to her and wanted a deed made." On the following day after the deed was signed, the defendant went to the office of Miss Sommers and paid for the services rendered.

Miss Sommers testified that, in her opinion, Hegarty knew "what he was doing and what he wanted to do." She "didn't notice anything wrong with him." Aside from the defendant and Hegarty, Miss Sommers was the only person present when the deed was signed.

Defendant is positive in her testimony that, soon after the deed was executed on August 7th, Hegarty also gave her the certificate of deposit, notwithstanding

she admits having turned the certificate, together with other papers, over to Mr. Slattery in keeping with the instructions of Hegarty. The court, with good reason, found against her on such issue. It might be said at this juncture that her claim of such gift without any foundation of fact tends to discredit other parts of her testimony.

Defendant testified that Hegarty "was a fine old man and in good physical and mental condition." Yet twelve days after the alleged gift, he admittedly threatened to kill her. She admitted in other parts of her testimony—and, no doubt, it was the truth—that Hegarty was a sick man. Indeed, two witnesses called by defendant testified that she told them in substance that when Hegarty first came to her house and she opened the door, he was in such weakened physical condition that he fell across the threshold.

In view of the confidential relationship existing between these parties and the physical and mental infirmities of the donor at the time of the alleged gift, a presumption of undue influence arises and it is incumbent upon the defendant donee to overcome the same. Under such a factual situation the burden of proceeding shifts to the defendant and she must establish that the gift was the free, voluntary, and unbiased act of the donor and that the transaction is fair and equitable: *Bliss v. Bahr,* 161 Or. 79, 87 P. (2d) 219; *Fischer v. Peters,* 147 Or. 426, 34 P. (2d) 305; *Jenkins v. Jenkins,* 66 Or. 12, 132 P. 542. As said in 12 R. C. L. 953, Gifts § 28, and quoted with approval in *Bliss v. Bahr,* supra:

"A gift between persons occupying confidential relations toward each other is, if its validity is

attacked, always jealously scrutinized by a court of equity, and unless found to have been made freely, voluntarily, and with a full understanding of the facts, will be invalidated. The existence of confidential or fiduciary relations imposes upon the recipient of the gift the onus of establishing its absolute fairness * * *."

In 24 Am. Jur. 757, Gifts § 49, it is said:

"It has also been held that if, at the time of a gift, the donor's mind was enfeebled by age and disease, even though not to the extent of producing mental unsoundness, and the donor acted without independent advice, such gift being a large portion or all of the donor's estate and operating substantially to deprive those having a natural claim to the donor's bounty of all benefit from the donor's estate, these circumstances if proved and unexplained will authorize a finding that the gift is void, through undue influence, without proof of specific acts and conduct of the donee. * * *"

██ Applying the above well settled legal principles to the facts we conclude that defendant has failed to overcome the prima facie case of undue influence. According to the defendant, Hegarty transferred the title to a substantial part of his estate to her without consideration. He is now hopelessly insane and can not give his version of what occurred. To all intents and purposes his lips are sealed in death. There was no strong bond of friendship which would prompt such a gift. The donee was the moving spirit in procuring the execution of the deed. Hegarty, through the persuasion of the defendant, was deprived of independent legal advice. *In re Brown's Estate,* 165 Or. 575, 108 P. (2d) 775; 24 Am. Jur. 757; Note 123 A. L. R. 1505. Only slight evidence is necessary to set aside a gift made under such circumstances.

Aside from the question of undue influence, we think it very doubtful whether Hegarty had sufficient mental capacity to transact business at the time of the alleged gifts.

That part of the decree sustaining the validity of the transfers of title to property to defendant is reversed. Defendant must account for whatever rentals were collected by her and is chargeable in the sum of $20, being the proceeds derived from auction sale of the carpenter tools. She must also restore whatever furniture was taken by her from the house owned by Hegarty. There is no showing of any misappropriation of funds entrusted to her.

It appears that defendant was not paid by Hegarty for his board and lodging. Defendant is entitled to offset this charge in her favor in the accounting.

Counsel for plaintiff is entitled to the sum of $350, payable from the estate, for professional services rendered in this and in the lower court. Neither party will recover costs or disbursements. The cause is remanded with directions to enter decree in keeping herewith.