Argued March 6; affirmed April 17, 1945

# GILLIAM ET AL. *v.* SCHOEN ET UX.

(157 P. (2d) 682)

Before Belt, Chief Justice, and Rossman, Kelly, Bailey, Lusk, Brand and Hay, Associate Justices.

*W. J. Cooper,* of Gresham (Cooper & McAllister, of Gresham, on the brief), for appellants.

*P. A. Schwabe,* of Portland (Hass & Schwabe, of Portland, on the brief), for respondents.

HAY, J.

This is a suit to cancel a deed of conveyance of real property by Elvira Schoen, a widow, (now deceased), in favor of Fred T. Schoen. The plaintiffs are three daughters and a grandson of the grantor. The defendants are the grantee, Fred T. Schoen, and his wife.

The complaint alleged that the grantor, at the time of signing the deed, was eighty-eight years old, and, by reason of her advanced age and of grievous illness with which she had been afflicted for some years, was weak, ailing and unsound of mind and body, and mentally incapable of transacting business or understanding her affairs. It alleged further that she was caused to sign the deed by undue influence exercised over her by the defendants. The answer was a general denial. The trial court decreed cancellation of the instrument, and defendants appealed.

Elvira Schoen and her husband Adolph emigrated from Germany to America in the year 1880, and, after some years in the middle west, came to Oregon in 1908. They had six children, four of whom were born in Germany and two in the United States. One child died in Germany; the others, except Fred, came to Oregon with their parents. Fred remained in the middle west, where he attended a theological seminary. In due time, he was ordained a minister of the gospel, and for a number of years pursued his calling in Oklahoma and in Wisconsin. In 1928, upon the urgent insistence of his parents, and at their expense, he came to Oregon, where.he received a call to a church at Sandy. He served that church for seven years, during

which time he organized and conducted a mission at Gresham. Thereafter, he removed from Sandy to Gresham, and became pastor of the mission there. Under his leadership, the mission became organized as a permanent congregation, and a church building was erected for its use.

During the lifetime of her husband, Mrs. Schoen had become the owner of two lots of land in the city of Portland, upon which dwelling houses had been built. The family resided in one of these houses. Adolph Schoen died in 1931. By that time, all of the children had married, and, for about four years after her husband's death, the widow continued to occupy the family residence. She seems to have been on cordial terms with all of her children, and the record indicates that all of them took a kindly and considerate interest in her welfare. In 1935, having suffered a fall and severely sprained her ankle, she was removed to the home of her daughter Ella Gilliam, who cared for her until she recovered. She then went to Salem, where she resided for some months with her daughter Johanna Miller. Afterwards she went to the home of her daughter Clara Van Horn, who lived with her husband on a farm near Albany, where she stayed for several months. From thence she went to Portland, to the home of her son Ernest and his wife, where she stayed for about seven years. During this period, in 1937, Ernest died, and Elvira remained with his widow, Martha, for about five years thereafter, although from time to time she paid short visits to all of her other children. In August, 1942, Martha was obliged to go to Salem to help her sister-in-law Johanna, in caring for the latter's sick husband, and thereupon Elvira removed to Fred's home in Gresham, where she re-

mained until her death. She died April 27, 1943, at the great age of ninety-two years.

Elvira Schoen appears from the evidence to have been an excellent type of German *hausfrau,* industrious, capable, a good mother, and a deeply religious woman. She never became proficient in English, but conversed habitually in German. Her reading was confined to her German Bible, and to newspapers and magazines printed in German.

Prior to the death of Adolph Schoen, he and Elvira executed deeds conveying to all of their children the two Portland lots which Elvira owned. Whether or not these deeds were delivered, or were intended to operate as testamentary devises, the evidence does not disclose. Elvira gave them to Fred at one time, but he testified that he returned them to her some years later, and does not know what became of them.

On two occasions, Elvira made gifts of money to Fred for the Gresham church, one of $600 and the other of $250. Her daughters expressed their disapproval of those gifts, and evidenced suspicion that the money had been appropriated by Fred to his own use, although such suspicion has no foundation in the evidence.

In December, 1938, while Elvira was still residing in the home of Martha Schoen, she executed the deed which is the subject of this suit. The testimony of Fred Schoen is the only evidence before us respecting this transaction. He testified that his mother told him that she desired to have all of her property go to the church after her death, and asked him to find out about making a will. He consulted a Portland lawyer of his acquaintance, who suggested that, under the circumstances, an outright conveyance would be more de-

sirable than a will. After reporting this to his mother, he had two deeds prepared by a real estate broker, in Gresham, with whom he was acquainted, each deed covering one of the lots. (Only one of the deeds is involved in this suit.) The instruments were warranty deeds, in favor of Fred T. Schoen individually, and not as trustee. After they had been prepared, Fred took his mother, in his own car, from Martha's home in Portland to the real estate broker's office in Gresham. The broker read both deeds over to Elvira, in English, word for word, and showed her where to sign. She signed the deeds, and the broker gave them to Fred. Fred then took Elvira back to Martha's house, where he gave the deeds to her and she immediately gave them back to him. Each deed recites a consideration of $10, and Fred testified that, when she gave him the deeds, he gave his mother two ten-dollar bills. He remained with his mother at Martha's house for an hour or two, during which time she gave him a letter, which is in evidence in this case. This letter is written in German, and an English translation reads as follows:

"To all my dear Children; I herewith testify, that inasmuch as the dear Lord has so graciously given me a long full life and bestowed so many blessings upon me, I now also wish to show my appreciation for His love and many blessings by bringing a thank offering to Him, not under the false pretense that by so doing I could merit Heaven and Salvation; but solely out of love for my Lord and Savior. So therefore it is now my last wish and will that the little property I possess through His Grace be given to the Mission especially for the building of Redeemer Evangelical Lutheran Church in Gresham, through my son Fred who is pastor of this church, in honor of all my children and as a memorial to your father and mother, but most of all in honor of our Lord God. I therefore entreat you dear

children not to sin against your brother Fred because of the fact that I commissioned him to carry out my will. It is self evident that he should do this since he serves this church and she needs it urgently. Therefore I remind you again, for God's sake do not commit a grievous sin against your mother and your brother for the sake of a few dollars. Besides you are not in need of it, having no heirs.

"In Love, Mother."

Fred testified further that his mother requested him not to inform her other children about the execution of the deeds, and, as a matter of fact, he gave them no information on the subject until the day of his mother's funeral. However, at his mother's insistence, he filed the deeds for record on August 30, 1939.

Elvira Schoen, when she executed the deeds, was eighty-eight years old. For some years, her health had been failing, and, as the evidence shows, she had been showing definite symptoms of senility. According to a neighbor of Martha's, who was well acquainted with Elvira during 1938, the year in which the deeds were signed, "she had the mind of a very old person— more like a child". She had personal habits which were indicative of senility. (Cf. *In re Rupert's Estate,* 152 Or. 649, 664, 54 P. (2d) 274.) When reproved by her daughter-in-law for indulging in such habits, she would "cry and fuss". She was "pretty nervous, kind of like a palsy", and "would shake quite a bit". She gradually and perceptibly failed from day to day, and became "perfectly child-like". As to her personal habits above mentioned, the evidence was corroborated to some extent by that of Mrs. Fred Schoen, one of the defendants. The plaintiffs' evidence portrays her as a very old lady who was unwell, nervous, senile, unable at times to recognize friends—even her own daughter—

and so confused mentally as to have difficulty in finding her way about the house. The defendants, on the other hand, offered evidence to show that she was in fairly good health, mentally competent and alert.

The burden of proving undue influence ordinarily rests upon the party alleging it. *Miller v. Jeffery*, 129 Or. 674, 278 P. 946; *In re Brown's Estate*, 165 Or. 575, 108 P. (2d) 775. Where, however, it is established that a fiduciary relationship existed between donor and donee, a presumption of undue influence arises, and the gift is prima facie void. *Brown v. Hilleary*, 133 Or. 26, 286 P. 593. Thereupon the donee is required to produce evidence sufficient to establish that the gift was the free and voluntary act of the donor, and that the transaction was fair and equitable. *Bliss v. Bahr*, 161 Or. 79, 87 P. (2d) 219; *Jenkins v. Jenkins*, 66 Or. 12, 132 P. 542; *Brown v. Hilleary*, supra; *Ramstead v. Bridges*, 175 Or. 182, 152 P. (2d) 306. The evidence— even the testimony of the defendant Fred Schoen himself, as a witness for plaintiffs—establishes that a fiduciary relationship existed between him and his mother. The transaction was in effect a gift, being supported by no adequate consideration. *Bliss v. Bahr*, supra. It involved substantially the whole of the donor's property. It excluded the plaintiffs who were, equally with the donee, natural objects of the donor's bounty. It was deliberately kept secret. The donee took a very active part in bringing about the consummation of the gift. These matters emphasize the confidential character of the relationship. *Brown v. Hilleary*, supra; *Ramstead v. Bridges*, supra. Mr. Schoen testified that, while he was not really his mother's pastor, she had a great deal of faith and confidence in him by reason of the fact that he was her son and a minister. The

whole affair indicates that, so far as she was capable of understanding what she was doing, the old mother was motivated by religious fervor, pride in her son, and confidence in his integrity. Moreover, the opportunity which the circumstances gave Mr. Schoen to advance his own interests in secret, and to sacrifice those of his mother, gives point to the fiduciary situation in which he was placed. *In re Knutson's Will,* 149 Or. 467, 41 P. (2d) 793. It is the policy of the law to scrutinize closely conveyances made by aged parents in favor of their children, and to set them aside if they were not reasonable, or were not entered into in good faith. 9 Am. Jur., Cancelation of Instruments, section 20.

■■ This court has frequently had occasion to state, and we now reiterate, that it is the duty of a donee who actively participates in matters of the sort under consideration here, to see to it that the donor, before carrying his presumably benevolent intentions into effect, receives independent and disinterested advice. *In re Rupert's Estate,* supra (152 Or. 649, 54 P. (2d) 274); *Ramstead v. Bridges,* supra (175 Or. 182, 152 P. (2d) 306); 24 Am. Jur., Gifts, section 49; 9 Am. Jur., Cancelation of Instruments, section 20. The failure of Mr. Schoen to safeguard his mother's interests by insisting upon her receiving such advice is, under all the circumstances, in itself sufficient to vitiate the transaction.

■ A higher degree of mental capacity on the part of a grantor is required to sustain the validity of a deed than is required of a testator to uphold a will. *Miller v. Jeffery,* supra (129 Or. 674, 278 P. 946); *Greene v. Maxwell,* 251 Ill. 335, 96 N. E. 227, 36 L. R. A. (N. S.) 418.

■ Although Elvira Schoen had only a very slight knowledge of English, and habitually spoke German,

the deeds were read to her in English. We venture the opinion that, if this was actually done, it was a meaningless proceeding. We gather from the evidence that she would have had considerable difficulty in following even an ordinary conversation in English, and it is entirely improbable that she could have made any sense of the formal phraseology of a deed of conveyance. The trial court, as a matter of fact, may reasonably have doubted that the deeds were read to her at all. The judge himself, referring to the reading of the deeds by the scrivener, asked Fred: .

"Q. (By the Court) Did he read it out loud? A. Yes, he read it out loud. Q. Did he read them in German or English? A. No, in English. Q. Did your mother understand English? A. *He just read over and showed her where to sign and all that.*"

The evasiveness—intentional or otherwise—of the last answer leaves us in the dark, both as to whether Elvira understood English, and whether the scrivener actually read the instruments over to her. The scrivener, be it noted, was not called as a witness. He was selected as scrivener by Fred; Elvira was not acquainted with him.

■ The letter which Elvira addressed to all her children, entreating them "not to sin against your brother Fred because of the fact that I commissioned him to carry out my will", would no doubt be strong evidence tending to support the validity of the transaction, if the court had believed that she was the unaided author of it, was competent, and was not influenced unduly by Fred. While the handwriting is undoubtedly Elvira's. the phraseology appears to be that of a person of some educational attainments, and despite arguments to the contrary on the part of appellants, we are

of the opinion that the evidence does not indicate that Elvira Schoen was a person of more than common-school education. There are in evidence a number of postcards written by Elvira, the wording of which tends to prove its own authenticity, being naturally what one would expect from a person of her age and background. There is not the slightest similarity between the language of the postcards and that of the letter, and nothing whatever to indicate a common authorship. We note, as a curious circumstance, which may or may not be relevant, that, whereas the letter is written throughout in Germanic characters, it is headed by the date, "December 6, 1938", in English characters, with the English, and not the German, spelling of "December". There may, of course, have been an innocent explanation of such inconsistency, but none was offered. It does seem improbable, however, that Elvira, having only a very slight knowledge of English, would have dated the letter in English characters. Incidentally, in addition to the testimony on the subject, Elvira's poverty of English is illustrated by the addresses which she wrote upon two of the postcards. Thus, on one, she spelled "Gresham" as "Grescham"; on another, she spelled "Powell Boulevard" as "Paul Bulleward". These are remarkable examples of the phonetic spelling of English by a person who was unfamiliar with that language, and who habitually used German.

We are of the opinion that the defendants failed to produce evidence of such character as to overcome the presumption of undue influence, which the fiduciary relationship of the parties to the deed, and the active participation of Fred Schoen in the transaction, imposed upon them. Moreover, there was credible

evidence, on the part of plaintiffs, of mental incapacity in the grantor. Slight evidence, in such a case, is sufficient to warrant a court in setting the transaction aside. We accord great weight to the conclusion of the trial judge, who saw and heard the witnesses, and we feel that his decision upon the evidence should not be disturbed.

The decree is affirmed, with costs.