Argued at Pendleton October 28, 1946; affirmed January 28, 1947

# LANPHEAR *v.* WOODS ET UX.

### (176 P. (2d) 653)

*A. S. Cooley,* of Pendleton, for appellant.

*E. F. Bernard,* of Portland (Collier, Collier & Bernard, and Wm. K. Shepherd, of Portland, on brief), for respondents.

Before BELT, Chief Justice, and BAILEY, LUSK, BRAND and HAY, Justices.

## LUSK, J.

This is a suit for the cancellation of a deed of conveyance of land to the defendants on the ground that it was procured by fraud. The plaintiff appeals from a decree of dismissal.

Plaintiff is a cousin of the defendant J. G. Woods. For many years she had been a resident of Los Angeles, where she executed the deed in question in January, 1944. She was then in her seventy-ninth year. The defendant J. G. Woods has lived in Sherman and Wasco counties in this state most of his life, and is now a resident of The Dalles. He was about sixty-three years of age at the time of the challenged transaction.

The land involved, a quarter section in Sherman County, Oregon, had been owned by the plaintiff and her sister, Julia Lanphear, as tenants in common, and had been leased by them to the defendant J. G. Woods in 1939 for a rental of one-third of the crop. Julia Lanphear died in the autumn of 1943, and plaintiff inherited from her an additional one-sixth interest in the land, and so was thereafter an owner of an undivided two-thirds interest. The deed was executed and acknowledged before a notary public for Los Angeles County, California, on January 10, 1944.

Plaintiff alleges in her complaint (1) that the defendant J. G. Woods induced her to execute the deed by falsely representing to her that "it would be

necessary for plaintiff to execute an instrument of writing whereby the interest of said Julia Lanphear in said land and inherited by plaintiff would be transferred to plaintiff", and that he "would cause such instrument in writing to be prepared for plaintiff's signature, and that he would then cause the interest of said Julia Lanphear * * * to be transferred to plaintiff, and that he, said defendant J. G. Woods would then lease said land of plaintiff as long as plaintiff lived, and pay plaintiff rental therefor"; (2) that said defendant prepared the deed and caused his sister-in-law to present it to the plaintiff for her signature; that his sister-in-law told plaintiff the instrument was "for the purpose of enabling said J. G. Woods to cause to be transferred to plaintiff" the Julia Lanphear interest in the land; and further stated to plaintiff that "she did not have time to permit plaintiff to read said instrument, although plaintiff desired and requested to be permitted to read" it, whereupon plaintiff executed it, relying on the statements aforesaid.

The representations of the defendant J. G. Woods are alleged to have been knowingly and intentionally false, but there is no such allegation respecting the statements of the sister-in-law.

■ We agree with the Circuit Court that the proof does not sustain these charges.

The original agreement of lease between Mr. Woods and his cousins was entered into in Los Angeles in 1939. The Lanphear sisters at that time suggested to him that he buy the land, but he told them he lacked the money. They then suggested a lease, and Mr. Woods agreed to this, the lease to commence, however, after the tenant then on the land should have harvested the 1940 crop.

Mr. Woods took possession of the land in the spring of 1941, farmed it, and in 1942 remitted to his cousins $1,500.00, their share of the crop as rent. He had correspondence with them concerning the business, but did not see either of them again until December, 1943. Late in 1943 he wrote them inquiring whether they still wished to sell the land, and, if so, at what price. About November 23, 1943, Hattie Lanphear, the plaintiff, answered his letter. She wrote that her sister Julia had recently died, and proceeded:

"I received your letter some time but did not get answered Julia was so sick. You ask if we still want to sell the land. Yes Julia and I have expected to sell our place to you ever since you were down. You were such a good renter we have had plenty to live on. You know the price of land. I don't. Julia and I have always intended when we passed away it should go to Missions as we have no one to leave it to—since Frank and Cora left us".

The plaintiff explained in her testimony that she referred to missionaries sent to China by her church in Los Angeles.

After receiving the foregoing letter Mr. Woods employed an attorney in The Dalles to prepare a deed conveying to defendants plaintiff's interest in the quarter section, and sometime in December went to Los Angeles, taking the deed with him.

Up to this point there is no substantial conflict in the testimony.

The substance of Woods' testimony as to what occurred after he reached Los Angeles is that he and the plaintiff agreed that she would sell him the land, and he would pay for it by paying her rent as long as she lived, and, on her death, would pay the then value of the property to "the Missions". If the rent should

not be sufficient to maintain the plaintiff, he would make payments on the principal which would be deducted from the final payment. The rent was to be one-third of the crop as theretofore. He also offered to pay her $1,000.00 at the time, but she declined, saying that she had a thousand dollars in the bank. This occurred at the home of the plaintiff. The parties apparently agreed on the terms of the sale on a Saturday after banking hours, and, as they considered it necessary to execute the deed at a bank and Mr. Woods had to return to Oregon the next day, it was not executed while he was in Los Angeles. He did not have the deed with him at the time, having left it at the Los Angeles home of his sister-in-law, Mrs. Nellie E. Randall, where he had been staying. He told the plaintiff he would send the deed to her, and thereafter evidently requested Mrs. Randall to attend to its execution by the plaintiff.

Mrs. Randall did so. As one of the charges in the complaint is that plaintiff was prevented from reading the deed and as the plaintiff so testified, Mrs. Randall's testimony is important. She swore that she went to Miss Lanphear's home on January 10, 1944, and told her that she had come "with the deed for Jim Woods in regard to the land in Sherman County that she was to sell to him"; that the plaintiff discussed the transaction with her and said, "I have always thought so much of Jim and he is the one person that I want to deal with and sell my property to in Sherman County"; that plaintiff suggested executing the deed at her own bank, which she named; that they went to the bank where the plaintiff said that there was a gentleman with whom she usually talked over her affairs when doing business there, but, not seeing him,

plaintiff sought out a Miss Messick, the bank's escrow officer, before whom, as a notary public, the plaintiff signed and acknowledged the deed. The plaintiff testified that she was well acquainted in the bank, knew Miss Messick, and had transacted there all the business that she had had. Concerning the actual execution of the deed Mrs. Randall testified:

> "And we got into the bank and the Notary took the papers, and she said, Miss Lanphear, you know exactly what you are doing, you have knowledge of what you are doing, and she said, yes, definitely, I certainly do; and then after she had signed this deed, she sat there for a few minutes and she said, let me see that deed; she said, you know Jimmie is in the habit of signing my name with an 'm' instead of an 'n'—anyway, it was (sic) or the other, and she said, let me see it, I am afraid he might have done the same thing again, and I certainly don't want any mistake, I want him to have this property —I don't want any errors. Well, the young lady said to her, Miss Messick said to her, well, you are a very smart woman, she said, I would not have noticed that myself, I think, Miss Lanphear, and said, What shall I do? You go right ahead, write your name, write below that and I will fix it up for you; and she did; and she told me how happy she was again that Jim was getting the property. I took the deed, took it home."

The deed is in evidence, and shows that plaintiff's name was originally typed therein "Lamphear" instead of "Lanphear"; that the plaintiff signed it first with the correct spelling and again as incorrectly spelled, and that the words "also known as Hattie Lamphear" had been typed into the acknowledgment.

Miss Messick gave her deposition, but had no independent recollection of the transaction. She was asked

whether Hattie Lanphear appeared to understand the nature of the document she executed, and said:

> "I am sure she came in voluntarily to sign the instrument. I would not have taken her acknowledgement if I thought she was signing it under compulsion or if she appeared not to understand what she was doing."

Mrs. Randall mailed the executed deed to Mr. Woods, who filed it for record in the deed records of Sherman County on January 19, 1944.

The plaintiff claimed in her testimony that the subject of the purchase of the land by Mr. Woods was never mentioned by him to her when he was in Los Angeles in December, 1943; that she asked him if he wanted to buy it, and he said that he wanted to rent it; that he was "going to rent it as long as I live". She testified that "I wanted to get the deed made out to me with Julia's share signed over to me * * * I told him, I says, you can make out the deed and send it to me and I will sign it; make it out in my name with Aunt Julia's share signed over to me. And that is what I thought I have signed." She further testified:

> "Q  Did he tell you that he would do that?
> "A  He didn't say anything, I don't think.
> "Q  He didn't say whether he would or would not?
> "A  No. I just trusted him to do it like he was my brother."

On cross-examination she denied that before her sister's death she had decided to sell the land to Jim (the defendant J. G. Woods). She said that she did not remember whether he had written her before coming to Los Angeles in December, 1943, or whether

she had written him. When shown the letter from which we have quoted above, she admitted that it was in her handwriting, but insisted that she had never received a letter from Mr. Woods asking if she and her sister still wanted to sell the land, notwithstanding that she had written him "I received your letter some time but did not get answered Julia was so sick. You ask if we still want to sell the land." And, as above stated, she was positive in her testimony that Woods said nothing to her about buying the land.

As to the execution of the deed the plaintiff testified that when Mrs. Randall came to her home she (plaintiff) said:

"Let me see the deed so I will read it; she said she didn't have time, she was in a hurry."

She swore that she didn't see one word of the deed, that her eyes "were not good", and that for more than a year thereafter she did not know that she had signed the deed in question. She got this information, she said, from Beatrice Baker, a relative. On cross-examination she admitted that she had never seen Mrs. Randall before the day of the execution of the deed, and that the latter was an entire stranger to her. She said that she did not protest against signing the instrument that Mrs. Randall refused to let her read. She explained, "I just trusted her." She admitted that she herself suggested her bank as the place for executing the deed, and that she had done business before with the notary public who took the acknowledgment. The record shows that while on the witness stand she was able to read her signature on the deed without glasses. She explained the reason for her signature appearing twice on the deed by saying, "I spelled the name wrong. I didn't see well enough that I had

written 'm' instead of 'n'." It should be noted, however, that her correct signature appears first on the deed written in a blank space opposite which someone had placed a cross-mark in pencil, apparently to indicate the line for signing. Underneath her name as correctly spelled she wrote it again with the incorrect spelling.

Mr. Woods did not see the plaintiff again until May, 1945, when he went to Los Angeles, taking with him Mrs. Woods and their daughter. He had heard from relatives that Miss Lanphear was dissatisfied with the deal. He discussed it with her in Los Angeles several times, and he and his wife and daughter testified that the plaintiff stated that she was satisfied with the deal, although, after talking the matter over, according to Woods' testimony, they agreed that instead of paying the purchase price to "the Missions" after plaintiff's death, he would pay $5,000.00 in addition to the rent within a short time thereafter. He also agreed that he would leave a check for her on account. He left a check for $500.00 at a bank in Los Angeles to be delivered to the plaintiff, but she refused to accept it, and the bank returned the check to him in Oregon. At the last conversation between plaintiff and Woods, plaintiff's niece, Ethel Craig, was present. At that time, according to Mr. Woods' testimony, Miss Lanphear said that she was satisfied with the deal, that "she was a little confused about the deed", but "it is just the way I want it, anyway", and Ethel Craig said that the deed "is not worth the paper it is wrote on" because "she wasn't capable of drawing up the deed— do business".

The plaintiff testified that she did not remember telling Mr. Woods in 1945 or at any other time that

she was satisfied with the deal, but otherwise did not testify about the 1945 conversations. Ethel Craig did not testify about them at all.

Ethel Craig testified to conversations which she had with the defendant J. G. Woods in December, 1943, in Los Angeles. They talked about the plaintiff's intended disposition of the Sherman County land, and he told her that he had papers in his suitcase which she "gathered * * * had something to do with a transfer of property from Aunt Julia's name into Aunt Hattie's." This, however, was pure assumption on her part. Woods testified, on the other hand, that in one of these conversations he told Ethel Craig that he wanted the land, and she said she did not want her aunt to sell it. He testified, further, that on one occasion when he and the plaintiff were about to leave plaintiff's house for the bank to "fix up the papers", Miss Craig came in and they talked over the proposed sale with her and she objected to it. Apparently, as a result of this incident, the deed was not executed on that day. Ethel Craig did not deny this testimony.

Our opinion, based on our study of the evidence, is that plaintiff entered into this transaction freely and understandingly and uninfluenced by any misrepresentations made by the defendant J. G. Woods, but that afterwards, probably at the suggestion of other relatives, she repented her of her bargain and brought this suit. We are not prepared to accept the evidence that, after the letters which passed between the parties about the purchase of the land, Mr. Woods went to Los Angeles and talked to the plaintiff about nothing except renting the land of which he was already a tenant. It is possible that Miss Lanphear, an old lady with little business experience, might have thought

that it was necessary for her to sign a paper of some sort in order to secure title to a part of her deceased sister's interest in the land. But we are far from convinced that this is what she thought she was doing when she executed the deed. Her testimony that she was not given time to read the instrument is altogether inconsistent with the circumstances of its execution. She herself testified that when Mrs. Randall came to her house they "went out in the yard and looked at the flowers." That would not indicate that she was rushed into the transaction.

Mrs. Randall's testimony is sharply criticised by counsel for the plaintiff. It was likewise attacked in the court below. But the circuit judge, in a carefully prepared memorandum opinion, said:

> "Regardless of what is stated by Plaintiff's Counsel in his Brief relative to the character of Mrs. Randall's testimony the Court was very much impressed at the trial by the manner in which she testified and she proved to be a very competent and intelligent witness."

We accept this appraisal of Mrs. Randall's testimony, which not only shows that the execution of the deed was not procured by fraud, concealment, deception or oppression of any sort, but also that the plaintiff was completely aware of the character of the instrument which she signed. The plaintiff's own testimony in this regard, it is necessary to add, is something less than ingenuous. It is impossible to reconcile her explanation of the two signatures on the deed with the facts. If it was Mr. Woods' purpose to secure the plaintiff's signature to an instrument of a different character than the one she intended to execute, it is hardly likely that he would have left that matter in the hands of his sister-

in-law, who, as has been stated, is not accused in the complaint of intentional wrongdoing. It is not disputed that Miss Lanphear selected the bank where the deed was to be executed, that it was the bank with which the plaintiff transacted her business, that Mrs. Randall was a stranger there. This circumstance tends strongly to negative the charge of fraud. The complaint contains an allegation that plaintiff was confined to her bed "when said sister-in-law of defendant J. G. Woods came to the home of plaintiff in said City of Los Angeles for the purpose of securing the signature of plaintiff to said instrument of writing."

The plaintiff's testimony conflicts with this allegation. She swore that when Mrs. Randall came to her house she was not ill in bed, but was up and about.

But the plaintiff asserts that the defendant J. G. Woods stood in a confidential or fiduciary relation towards her, and that as in *Gilliam v. Schoen,* 176 Or. 356, 157 P. (2d) 682, and *Egr v. Egr.* 170 Or. 1, 131 P. (2d) 198, and like cases, the burden is upon the defendants to show that the transaction was fair and equitable and free from undue influence, and that this burden has not been sustained.

■ Assuming that the rule of fiduciary relations applies to this case, we are of the opinion that the burden which thus would be cast upon the defendants has been met. The plaintiff alleged in her complaint that the value of her interest in the land is $6,000.00. The proof shows that the consideration paid and to be paid comes to about $7,800.00 This includes $5,000.00 agreed to be paid, the 1944 rent, the estimated 1946 rent (the land yields a crop only every other year), and certain taxes paid by the defendant J. G. Woods when he was plaintiff's tenant, and which he agreed at the time he

leased the land in 1939 that he would advance and would absorb in the event that he should later buy the property. There can be no question, therefore, of the fairness and adequacy of the consideration.

■ It is argued that the deed must be cancelled because plaintiff had no disinterested, independent advice before entering into the transaction. We do not understand that there is a hard and fast rule that a transaction between persons standing in a fiduciary relationship cannot stand in the absence of such advice. See Note, 123 A. L. R. 1505. It may be indispensable in particular circumstances, as in *Gilliam v. Schoen,* supra. There are other cases in which slight evidence of undue influence will suffice to set aside a transaction where independent advice has not been received by the party reposing confidence in another. *Ramstead v. Bridges,* 175 Or. 182, 152 P. (2d) 306. But we think that, as stated in *Inche Noriah v. Shaik Allie Bin Omar,* [1929] A. C. (Eng.) 127, 16 B. R. C. 365—P. C., independent legal advice is not the only way in which the presumption of undue influence arising from a fiduciary relationship can be rebutted.

While it is true that the defendant Woods did not take the plaintiff to a lawyer for advice, it is also true that he made no effort to prevent her from consulting others, and that she had ample opportunity to do so before executing the deed. In this connection it is to be observed that plaintiff's niece, Ethel Craig, who, we are satisfied, knew in a general way at least the terms of the transaction, advised her aunt against it. Miss Craig is a school teacher whose testimony reveals an intelligent and positive character. It is apparent that she was a close and, at times, almost constant associate and companion of the plaintiff,

while Mr. Woods had seen the plaintiff only two or three times in a period of over thirty years. As between the two, we think it a reasonable assumption that she was in the better position to dominate the plaintiff's mind. The fact is, we think, that it was not dominated and that plaintiff, in selling the land to Mr. Woods, did what she had long intended to do, notwithstanding Miss Craig's objections.

The complaint alleges that the plaintiff was debilitated and enfeebled with age, and weak and nervous. It appears that in December, 1943, the plaintiff was recovering from an illness following her sister's death. When she executed the deed in January, 1944, she was, so far as the record shows, in good health. There is no evidence that she was suffering from any disability or infirmities other than those which ordinarily attend advanced age. Aside from a measure of forgetfulness, there is no evidence of impairment of her mental faculties, and nothing whatever to indicate that she was not fully capable of comprehending the nature of the transaction. Even in 1946, more than two years after the deed was executed, she was able to make the long trip from Los Angeles to The Dalles, where the case was tried, and give her testimony. And some of her answers show a marked degree of mental agility.

Viewing the case in its entirety we think that the deed should stand.

It is said in plaintiff's brief:
    "The deed is a pure warranty deed, not only so, but it purports to convey the entire title instead of the two-thirds interest owned by plaintiff."

■ The deed conveys to the defendants "all the following real property, with the tenements, heredita-

ments and appurtences situated in the County of Sherman and State of Oregon, bounded and described as follows, to-wit: All my right, title and interest in and to: The southeast quarter (SE¼), Section Six (6), Township One (1) South of Range Seventeen (17) East of the Willamette Meridian.'' The habendum clause is followed by a covenant of general warranty. A conveyance of all the grantor's right, title and interest in and to certain described property, unless a contrary intent is otherwise shown, passes only such title as the grantor has. 18 C. J., Deeds, 316, § 302; 26 C. J. S., Deeds, 415, § 117 c. And covenants in a deed cannot control the premises when the latter are free from doubt. 18 C. J., Deeds, 334, § 331; *Deering v. Long Wharf,* 25 Me. 51, 63; *Corbin v. Healy,* 20 Pick. (Mass.) 514, 516; *Fortune v. Hunt,* 152 N. C. 715, 68 S. E. 213. The effect of the deed, therefore, is to pass only the interest which the plaintiff had in the land at the time of its execution. This is all that defendants claim and all that they acquired.

The decree of the Circuit Court is right and is affirmed.

BRAND, J., did not participate in this decision.