Argued March 20, affirmed July 2, 1929.

CAROLINE E. MILLER ET AL. *v.* FLORENCE JEFFERY ET AL.

(278 Pac. 946.)

For appellants there was a brief over the name of *Mr. Chester A. Sheppard,* with an oral argument by *Mr. Wm. C. Ralston.*

For respondents there was a brief over the names of *Mr. Geo. D. LaRoche* and *Mr. J. J. Fitzgerald,* with an oral argument by *Mr. J. B. Ofner.*

RAND, J.—On March 20, 1925, Edna C. Dalton, who was then ninety years of age, executed a deed conveying to the defendants jointly lot 1 of block 160 in east Portland, now in the City of Portland. Mrs. Dalton died on January 15, 1926. The plaintiffs, Caroline E. Miller and William L. Dalton, are children of said grantor and the other plaintiff, Walter E. Linnett, is a nephew. The defendants are husband and wife and Florence Jeffery is also a daughter of the grantor.

Plaintiffs brought this suit seeking to have the deed set aside on the ground that it was procured by undue influence of the defendants and because of the grantor's lack of sufficient mental capacity to make a deed. Upon consideration of the evidence offered on the trial, the learned trial court entered a decree setting aside the deed and, from that decree, defendants have appealed.

While this suit involves but one transaction, there were other transactions between Mrs. Dalton and the defendants, which were established upon the trial and are material because explaining the motives which seem to have actuated the defendants in their dealings with Mrs. Dalton.

The evidence shows that Edna C. Dalton, at the time of these transactions, was a widow, her husband having predeceased her many years before her death. Upon his death she became vested with the title to all of said block 160 except lot 7, which belonged to her son William, and another lot which belonged to Herbert, another son, who died in 1919. Upon Herbert's death, the title to the last-mentioned lot vested in his mother as his sole heir at law. Upon the property in controversy is a brick garage

which rents for $100 or more per month. On lots 5 and 6 there is a large and pretentious dwelling-house in which Mrs. Dalton made her home for many years prior to her death. On the remainder of the block owned by Mrs. Dalton there were several houses which had been rented for an aggregate rental of about $100 per month. William Dalton resides upon his lot, which adjoined his mother's home. Herbert lived with his mother until his death. The other children were then all married and had homes of their own.

Shortly after Herbert's death, an arrangement was entered into between Mrs. Dalton and Mrs. Jeffery whereby Mrs. Jeffery and her husband should live with Mrs. Dalton at her home and each pay one half of the household expenses, and, after a conference with her children, Mrs. Dalton, on November 14, 1919, made a will in which she bequeathed to each child a part of her household goods and personal effects and devised to Mrs. Jeffery lots 5 and 6, the home property, to Mrs. Miller lots 3 and 4, and to William Dalton lots 2 and 8, and lot 1, the property in controversy here, to her three children and her said nephew, and William was to be appointed as executor of the will to serve without bonds. All of the testimony shows that in 1919, when the will was made, Mrs. Dalton was in good health, of sound mind and thoroughly understood what disposition she wished to make of her property.

Pursuant to such arrangement, Mrs. Jeffery and her husband commenced living with Mrs. Dalton at her home and remained with her until her death except for a period of about six weeks during each summer when they went to the beach and Mrs. Miller stayed with Mrs. Dalton at her home except for an

occasional night when either William or the nephew stayed there.

There is no evidence in the case that the disposition of the property which was made by the will was not entirely satisfactory to any of the children. It seems to have been a very equitable division of the property and fair to all parties. The evidence shows that the two lots which were devised by the will to Mrs. Jeffery, together with the dwelling-house thereon, was worth about fifteen or sixteen thousand dollars. This was the most valuable of all of the devises. The garage property, which is in controversy here and which by the terms of the will was to be divided among the four devisees named, was worth about the same amount but was subject to a mortgage of $4,500. The properties devised to the others were of considerably less value than that devised to Mrs. Jeffery.

However, in 1922, Mrs. Dalton, for some reason not disclosed by the evidence, wished to make a slight change in the will. She sent for her attorney, who up to that time, the evidence shows, had represented her in legal matters, and had him prepare a codicil which she executed. By this codicil lot 2, which, under the will, was to be devised to William, was devised to her nephew and lot 1, the property in controversy, which had been devised to the three children and the nephew, was devised in equal shares to William Dalton and Mrs. Miller. Except as thus changed, the will was to be in full force and effect. This codicil was prepared and executed during the absence of the Jefferys at the beach. The evidence shows that this change in the terms of the will was made wholly at the request and under the direction of Mrs. Dalton. Up to this time, the evidence shows,

that, except for such business matters as Mrs. Dalton herself attended to, William had transacted his mother's business. After the Jefferys had returned and learned of the change made by the codicil, Mrs. Jeffery testified to the following conversation with Mrs. Dalton:

"I had a conversation with my husband in this matter. So then he said to Mother, he said, 'Well, what have you been doing while we have been gone?' 'Oh,' she says, 'Nothing much.' And he says, 'Well, what is that much?' And she said, 'Oh, nothing much.' And so he says, 'Well, I hear you have had the lawyer over here.' 'Yes,' she said she had; and then she told him that she had taken my share of this brick building away and given it to my sister. And he said to her, 'Well,' he says, 'Mother, do you think that is any way to treat Florence when she is not here?' She didn't say anything. 'Well,' he says, 'I think the best thing you ought to do is to put that back, give Florence her share back again.' He says, 'I don't think that is any way to do.' And I don't know that he ever said anything more to her about it. Finally one day she said to me—we were talking about it and she said,—I said to her, 'Mother,' I said, 'I think the best thing for you to do is to put that back where it belonged, where it was before.' I said, 'I think it will save trouble.' 'Well,' she says, 'if you think that,' she says, 'go and tell Mr. Heilig to do it' * * ."

After these conversations were had between the defendants and Mrs. Dalton, a second codicil was made and executed revoking the first codicil and reinstating the will according to all of its original terms. This circumstance, in connection with those hereinafter referred to, leads us to the conclusion that the deed in question was not the voluntary act of Mrs. Dalton and that it was procured by the de-

fendants through the exercise of undue influence. It is not disputed by any witness that Mrs. Dalton's mind, after 1919, became very much enfeebled through old age or disease and that along toward the end of her life she became wholly incapacitated for transacting any business although there is evidence tending to show that, when requested by Mrs. Jeffery, she signed checks which had been prepared for her, almost up to the time of her death. The whole evidence shows that she became very hard of hearing, so that it became extremely difficult to converse with her; that she lost her eyesight, so that she could not read even with a magnifying glass; that she lost her memory, so that upon one occasion, upon Mrs. Jeffery's return from the beach, as testified to by Mrs. Jeffery herself, her mother at first did not know her; that her memory became so defective that she did not know that her son Herbert had died and often thought while talking with William that he was Herbert; that she had forgotten all of the incidents of her earlier life and remembered none of them; that when any of her old-time friends, with whom she had been intimate, called upon her she did not know them and they could not make themselves known to her; that she did not know her daughter Caroline when she called on her mother, nor her granddaughter with whom she had been on terms of intimacy. The evidence also shows that she was suffering from arteriosclerosis and that she was very much enfeebled physically as well as mentally during the last years of her life.

In the fall of 1922, when this conversation between Mr. Jeffery and Mrs. Dalton took place as testified to by Mrs. Jeffery, Mrs. Dalton was an old woman eighty-seven or eighty-eight years of age, in feeble

health and with a weak mind, and, because of this fact, it seems to us that the demand made upon her was not a request but a command which a woman in her weakened condition and under the circumstances disclosed would feel bound to obey. In her conversations with Mrs. Miller and Mr. Dalton, they each testified that Mrs. Dalton often complained to them that the Jefferys were all of the time trying to get more and more of her property.

The testimony further shows that, notwithstanding the agreement between the defendants and Mrs. Dalton that one half the household expenses should be borne by the Jefferys, it was only complied with by them for two or three years and that after that time all the expenses of the household were paid by Mrs. Dalton with checks which Mrs. Jeffery prepared and had Mrs. Dalton sign. The evidence further shows, and it is admitted by Mrs. Jeffery, that Mrs. Dalton even paid Mr. Jeffery for mowing the lawn and putting the wood in the basement, but she testified that this occurred only once. However, whether once or constantly, it was in violation of Mrs. Jeffery's agreement with her mother.

Mrs. William Dalton testified that Mr. Jeffery at one time stated to her that it would be to their individual interests if Mrs. Dalton would convey her property to her children before her death rather than to have it pass under the will and that, upon her declining to have anything to do with the matter, he told her that she was a "damn fool." Jeffery was not called as a witness in the case and the testimony just referred to was not contradicted.

Both Mrs. Miller and Mr. Dalton were opposed to the making of any deeds by their mother during her

lifetime and both of them remonstrated with Mrs. Jeffery against her permitting it to be done. Notwithstanding such opposition upon their part to the making of any deeds, the evidence shows that, without consulting with any of the other children and without Mrs. Dalton taking any independent advice, the defendants induced Mrs. Dalton to execute a deed on January 25, 1925, conveying lots 5 and 6, the home property, to Florence Jeffery and George Jeffery jointly, thereby creating an estate by the entirety which upon the death of either grantee would pass to the survivor, and in case of Mrs. Jeffery's death during the lifetime of her mother would vest absolute ownership of her mother's home in George Jeffery, which would have enabled him to have ousted her mother from her own home. That deed was immediately placed of record and when it came to the knowledge of Mrs. Miller and Mr. Dalton they objected very strenuously to what had been done and demanded that the defendants should reconvey the property to their mother, saying that it would pass to them upon her death under the terms of the will. This transaction caused a bitter feeling between the children and, upon Mrs. Miller's going to her mother's home, she was assaulted by her sister. Mrs. Miller then wrote a very kind and affectionate letter to her sister, again asking the reconveyance of the property by them to her mother. In reply thereto, she received the following letter from Mrs. Jeffery, dated February 25, 1925:

"Dear Carrie:

"Yours of Feb. 22nd received, and I have read it to Mother and she says she doesn't want any changes made in regard to this or any of the other property, but wishes things to be as they are. It isn't what

Will, you or I may want but what Mother wishes, so I have nothing more to say, only that if you want to shorten Mother's life you are taking the right way to do it.

"FLORENCE."

Notwithstanding the declarations there made by Mrs. Jeffery, on March 20, 1925, the defendants induced Mrs. Dalton to not only execute the deed to the property in controversy here but also they induced her to sign a bill of sale transferring to them jointly all of the furniture and household effects in Mrs. Dalton's home, thereby stripping her not only of her home but of everything in it. When these transactions are all considered in the light of Mrs. Dalton's extreme old age, physical disability and great mental weakness, it is strong evidence tending to show that Mrs. Dalton was acting under compulsion and coercion and not of her own free will.

There was some evidence tending to show that while Mrs. Dalton was so living with her daughter and dependent upon her for care, the defendants informed her that unless she would accede to their wishes and make the conveyances and bill of sale to which we have referred, they would abandon her and leave her without anyone to care for her.

Referring particularly to the garage property, the evidence shows that on the same day the bill of sale was given, March 20, 1925, the deed in question was executed which was some ten months before the death of the grantor. Its existence was concealed until the day of Mrs. Dalton's death when it was placed of record. According to Mrs. Jeffery's testimony, the agreement with her mother was that it should not be placed of record until her death and that the mother was to have the rents as long as she lived

and that the Jefferys should pay the mortgage indebtedness against it for $4,500, and that her mother's reason for conveying the property to her and her husband was that she was the only one of the children who could pay off the mortgage. The lowest reliable estimate of its value was that it was worth about $11,000. Other witnesses placed its value much higher. The deed recites that it was sold subject to the mortgage and that the grantees assumed and agreed to pay the same. There was, in addition to the mortgage indebtedness, a lien against the property for street improvements amounting to $157.18. The deed contained no reference to the lien and warranted that it was free from all encumbrances except the mortgage. The consideration expressed in the deed was the payment of $10 and care and services rendered to the grantor by the grantees for many years. The agreement, however, under which the services were rendered was that Mrs. Jeffery and her husband should live in Mrs. Dalton's home and pay one half of the household expenses and that Mrs. Jeffery should care for her mother in consideration of her mother's devising to her the home property upon her mother's death. This contract on Mrs. Jeffery's part was complied with only partially. Mrs. Dalton paid all of the household expenses during the last three or four years of her life, during which time the Jefferys paid nothing. There is no pretense that the $10 mentioned in the deed or any part thereof was paid. The Jefferys never paid the mortgage nor any part thereof and no valuable consideration ever passed for the deed.

On January 13, 1926, two days before Mrs. Dalton's death, a check purporting to have been signed

by her for said sum of $157.18, in payment of the amount of the lien referred to was presented to the bank and paid out of Mrs. Dalton's personal funds. There was, therefore, no valuable consideration for the deed. There is no pretense that the consideration was love and affection.

We think that the evidence establishes beyond question that, (1), the defendants procured the deed by the exercise of undue influence upon Mrs. Dalton, and (2), that the grantor did not have mental capacity to make a deed on March 20, 1925.

■ ■ Ordinarily, the burden of proving undue influence rests upon the person alleging it but, says Mr. Pomeroy, "in a case of real mental weakness, a presumption arises against the validity of the transaction, and the burden of proof rests upon the party claiming the benefit of the conveyance or contract to show its perfect fairness and the capacity of the other party": 2 Pomeroy's Equity Jurisprudence (3 ed.), § 947. Mr. Jeffery, whose name was brought prominently into the case because of his conduct in procuring the transfer and conveyances referred to, was not a witness in the case. Mrs. Jeffery testified, and we think truthfully, in respect to these various transactions, but, as we view her testimony, it supported the plaintiffs' testimony in establishing the undue influence of the defendants and also Mrs. Dalton's incapacity to make a deed at the time she conveyed the property in question.

" * * In proving undue influence, there must be evidence to satisfy the court that the free agency of the donor or testator was destroyed at the time the instrument was made, so that, in effect, the deed or will does not express the mind and intent of the donor or testator, but is the act of the person exercising the influence. To constitute undue influence,

the mind of the donor or testator must be so controlled or affected by persuasion or pressure, artful or fraudulent contrivances, or by the insidious influence of persons in close confidential relations with him, that he is not left to act intelligently, understandingly, and voluntarily, but becomes subject to the will or purposes of another."

*Howard* v. *Farr*, 115 Minn. 86, 92 (131 N. W. 1071, 1073).

■ ■ Giving to Mrs. Jeffery's testimony the weight to which it is entitled, it shows that the grantor was of feeble mind and was acting without the knowledge of her other children and did not have the benefit of independent advice when she signed the deed. The influence of a mother over her daughter, or of a daughter over her mother, when both are in full control of their mental faculties, is very strong and if that influence is exercised in a proper manner, it is commendable but when, as in this case, the mother is very old, and dependent upon her daughter for her care, comfort and necessities, and is suffering from extreme feebleness of mind, no transaction by which the daughter gains an advantage over the mother is fair or just. Under such conditions the daughter becomes the dominant party and any influence exerted by the daughter over the mother which induces the transfer of her property to the daughter, unless the transaction is one which is advantageous to the mother, is undue influence because wrongful and not exerted for proper ends. In determining whether there has been undue influence, the age and feebleness of the grantor, the relationship of the parties, the character of the transaction, and the mental condition of the grantor are all elements which must be considered. In the instant

case every element constituting undue influence was present. Mrs. Dalton's mind, in her then enfeebled condition, was overcome by the importunities of the defendants and her free agency was destroyed by their insistent and persistent demands that she transfer her property to them. Under the conditions shown by the evidence, their acts amounted to coercion and compulsion and their will and not hers was exercised in making the conveyance.

■ That she did not have sufficient mental capacity to make the deed in question we think is clear from the evidence. She may at the time have comprehended that she was making a deed and probably did so, but she did not have the capacity to comprehend the value of what she was conveying nor the interests of her other children, nor whether the conveyance would be an injury or detriment to her.

"It is not enough to sustain this conveyance that the grantor comprehended that he was making a deed of the property. The mental capacity required to sustain the validity of a deed is of a higher degree than that required to enable a testator to make a will. For the latter purpose it is sufficient for the testator to understand the business in which he is engaged, his property, the natural objects of his bounty, and the distribution he desires to make of his property. To sustain a deed, however, he must have the ability to transact ordinary business. The testator has no antagonist to meet, but in ordinary business transactions are involved a contest of judgment, reason, and experience, and the exercise of mental powers not necessary in the testamentary disposition of property. Mental strength to compete with an antagonist, and understanding to protect his own interest, are essential in the transaction of ordinary business. *Ring* v. *Lawless*, 190 Ill. 520 (60 N. E. 881). One may be capable of making a will, yet incapable of disposing of his property by contract or of managing

his estate. *Greene* v. *Greene*, 145 Ill. 264 (33 N. E. 941). Henry Troxel had not the mental strength to resist the demands of his cousin, or to protect his own interest in dealing with him. He had not the capacity to comprehend the value of what he was conveying, or whether he would be benefited or injured by the conveyance." *Greene* v. *Maxwell*, 251 Ill. 335, 340 (96 N. E. 227, 228, 36 L. R. A. (N. S.) 418, 420).

After a reading of the entire record and a study of the testimony, we are convinced that the decree of the lower court should be affirmed and it is so ordered.                                        AFFIRMED.

McBRIDE, BEAN and ROSSMAN, JJ., concur.