Argued December 19, 1957, affirmed as modified May 21, 1958

# TOOMEY *v.* MOORE ET UX

325 P. 2d 805

*Floyd D. Hamilton,* Portland, argued the cause for appellant. On the brief were Theodore Opsund and Ray G. Brown, Portland.

*Samuel B. Weinstein,* Portland, argued the cause for respondent. With him on the brief was Floyd D. Moore, Portland.

Before PERRY, Chief Justice, and ROSSMAN, BRAND and McALLISTER, Justices.

McALLISTER, J.

This suit was instituted by Hans O. Sater, as guardian of the person and estate of Hulda Hollander, an incompetent, against Floyd D. and Marion C. Moore, husband and wife, to recover from said defendants certain property transferred to them by said incompetent including her home, household furnishings and effects and bank account.

The trial court entered a decree giving plaintiff judgment against defendants for $4,928.89, requiring defendants to deliver to the guardian all of the household furnishings and other personal property, but finding that the deed conveying the home to defendants was a valid conveyance. From this decree the guardian has appealed contending that the court erred in holding that the deed was valid, in refusing to charge the defendant with interest and in denying the plaintiff costs in the trial court.

During the pendency of this appeal Hulda Hollander died and R. J. Toomey, as administrator with will annexed of her estate, has been substituted as appellant in lieu of said guardian.

The defendant, Floyd D. Moore, is an attorney who has practiced law in Portland for more than 30 years. He first met Hulda and her husband, Emil Hollander, in 1927 when they consulted him about the purchase of a parcel of real property. From time to time thereafter the Hollanders consulted Moore when they needed the advice and assistance of an attorney and over the years the relationship of attorney and client developed into a personal friendship. Moore testified that when the Hollanders were temporarily in financial need, he loaned them small sums of money and guaranteed payment of their debts. The relation-

ship between the Hollanders and Moore was described by him as very intimate.

Emil Hollander died in 1950. The Hollanders had no children and Hulda's only relative was a brother from whom she had not heard in many years. After Emil's death, Moore visited Mrs. Hollander with increasing frequency. When he had occasion to be in the vicinity of her home, Moore would drop by and take her along with him for a ride in his automobile. Hulda called at his office frequently during 1953 and 1954. Since she had no particular need for legal advice these calls apparently were merely friendly visits.

Moore testified that whenever the weather was bad during the period from the fall of 1952 until the spring of 1954, he went to Mrs. Hollander's home on either Friday evening or Saturday morning to take her shopping for her supplies for the coming week. He testified that "ofttimes when I went on a Saturday I would go at ten or in the late morning and we would go shopping and she would buy her supplies for the coming week, and we would go back and have lunch together, and on many of those occasions I worked around the house and the yard." Except when they met in public or in his office, Moore and Mrs. Hollander greeted each other with a kiss or a caress.

The relationship between Moore and Mrs. Hollander during the period involved in this case is summarized by Moore's testimony that Hulda had absolute trust, confidence and faith in him both as a lawyer and as a friend and would, in childlike fashion, accept his suggestions and advice.

On August 9, 1951, Mrs. Hollander executed a will naming as the sole beneficiary of her estate Phillip Ellman, who had formerly been pastor of the Augustana Lutheran Church in Portland but was then

living in Berkeley, California. Floyd Moore, who had drafted the will, was named executor and referred to by the testator therein as her friend and attorney.

On September 24, 1953, Mrs. Hollander executed a codicil to her 1951 will by which she bequeathed the sum of $1,000 to Floyd Moore. Moore dictated this codicil to his secretary but left his office while the codicil was executed. The codicil was witnessed by Olive D. Powne and Lillian Robinson, the two secretaries who were employed by Moore and three other attorneys with whom he shared a suite of offices.

On October 19, 1953, Mrs. Hollander executed a new will leaving all of her property to Floyd Moore except her piano which was bequeathed to her church. This will was drafted by Moore but was executed in the office of Arthur H. Lewis, one of the other attorneys sharing the suite of offices. The will was witnessed by Mr. Lewis and the secretary Lillian Robinson.

On October 28, 1953, Mrs. Hollander, who was then about 71 years old, executed a bargain and sale deed conveying her home to Floyd D. and Marion C. Moore, as tenants by the entirety, but reserving to herself a life estate in the property. Moore testified that about a week before the deed was executed Mrs. Hollander had first told him of her intention to deed her home to him and his wife. He refused to prepare the deed at that time and told Mrs. Hollander to think it over and if she still wanted the deed drafted to go to someone else. The drafting and execution of the deed were described by Mr. Moore as follows:

"As I stated, I was busy with a client and when I started to leave to go to the bank she told me she wanted to have that deed drawn, so I asked my client to wait a minute and I discussed it with her, and I said, 'Well, wait until I get the description,' so I went to the safe and got the description and

got a blank form of deed, and went to my stenographer, Mrs. Powne, and dictated the life reservation and the deed was drawn while I was at the bank, and when I returned Mrs. Powne—Mrs. Robinson now had gone for her lunch—so Hulda and I went out to lunch, and when we had returned and Mrs. Robinson had returned, I asked Mrs. Robinson and the other secretary to talk to her about the execution of the deed, and I absented myself again during the execution of the deed, and Mrs. Robinson took care of the execution of the deed."

The deed was recorded on the same day.

On November 2, 1953, a savings account in the sum of $5,342.10 which Mrs. Hollander had in the Oregon Mutual Savings Bank was changed to a joint account with Floyd Moore. On November 19, 1953, $5,000 was drawn from that account and deposited in the Rose City Branch of the First National Bank of Portland where Mrs. Hollander also had a small savings account. This account was also changed on that date to a joint account with Floyd Moore. At the same time Moore was given a key and joint access to Mrs. Hollander's safety deposit box in which they placed the pass book for the savings account. On January 25, 1954, the account in the Oregon Mutual Savings Bank was closed and the balance transferred to the account in the Rose City Branch of the First National Bank.

On August 7, 1954, Mrs. Hollander left by train for Duluth, Minnesota to visit Rudolph Hollander, the brother of her deceased husband. All arrangements for this trip had been made for her by Mr. Moore. Moore testified that he took Mrs. Hollander to the train and that as he was bidding her goodbye, the following occurred:

"I kissed her good-bye and wished her a good

vacation and started to leave. She said, 'Wait a minute.' She pulled out her key to the lock box and the key to the house and said, 'This is yours.' I said, 'Hulda, everything will be taken care of. I thank you. Everything will be reserved for your use as long as you need it. I will never draw on that bank account for my own use so long as it exists,' and I left the train."

Defendants contend that by handing Moore the key to her home and lock box with the statement that "This is yours", Mrs. Hollander thereby transferred to defendants the savings account and the household furnishings and other personal property situated in her home.

Upon her arrival in Duluth two days later, Mrs. Hollander was in a badly confused mental condition and in response to a telephone call from her relatives, Mr. Moore went to Minnesota and brought her back to Portland.

On August 16, 1954, Mr. Moore withdrew from the Rose City Branch of the First National Bank all of Mrs. Hollander's savings account in the sum of $5,006.03 and placed the funds in a joint savings account with his wife in another bank nearer the Moore home.

Upon the petition of Mr. Moore and another person, Hulda Hollander on August 24, 1954, was committed by the circuit court of Multnomah county to the Eastern Oregon State Hospital as a mentally ill person.

On August 26, 1954, Mr. Moore filed a petition in the circuit court for Multnomah county praying for his appointment as guardian of the person and estate of Mrs. Hollander. A number of Mrs. Hollander's friends and neighbors protested the appointment of Moore as her guardian and after a hearing, Hans O.

Sater, one of the protestants, was on November 23, 1954, appointed guardian. Thereafter, on November 29, 1954, the said guardian brought this suit to cancel the deed and recover the bank account and the personal property.

Although the degree of her senility can not be stated with exactness, there was substantial, competent and convincing evidence that Mrs. Hollander during the period material to this case was suffering from senile dementia. This senility was noticeable long before the deed in question was executed on October 28, 1953 and culminated in the commitment of Mrs. Hollander to the mental hospital in August, 1954. This evidence was given by disinterested friends and neighbors and by Dr. Henry H. Dixon, an eminent physician and psychiatrist.

We will not prolong this opinion with a recital of the evidence concerning Mrs. Hollander's mental condition but will point out one incident of particular significance. The Hollander home was located at 4420 NE Halsey which was adjacent to Sullivan's gulch along which the Banfield freeway was constructed. Across the gulch in an area visible from Mrs. Hollander's home, a number of houses had been removed from the right-of-way of the new freeway. On October 6, 1953, Mrs. Hollander called on a neighbor, Eva M. Schroeder, with a notice that she had just received from the city auditor stating that the city council would consider at its next meeting a proposal to change the area around the Hollander home from a residential to a business zone. Mrs. Schroeder was interested in the proposed zone change and had circulated a petition opposing it. Mrs. Hollander was confused and frightened by the notice and expressed a fear that her house might be moved away. Mrs. Schroeder ex-

plained the proposed zone change and as best she could assured Mrs. Hollander that her house was not going to be moved or disturbed in any way by a zone change.

Mrs. Hollander went with Mrs. Schroeder to the meeting of the council in the city hall the following morning. The two women attended the hearing until the noon recess and returned after lunch. During the afternoon, Mrs. Hollander attempted to speak to the council and said that she had lived in her home for 30 years and would like to stay there. She was crying and obviously disturbed and the mayor attempted at some length to reassure her that she would neither lose her home nor have to move. We think this evidence shows clearly that Mrs. Hollander was fearful that her home was in danger and further, that she had no understanding of the nature or effect of the proposed zone change. Whether or not this experience influenced Mrs. Hollander in any degree when she deeded her property to Mr. Moore about two weeks later we are unable to say. It did demonstrate a lack of ability at that time to look after her own affairs.

■■ The above review of facts is sufficient to indicate the proper disposition of this case. The duty of an attorney when dealing with his client has been stated with clarity by Mr. Justice HARRIS, in *Kirchoff v. Bernstein,* 92 Or 378, 387, 181 P 746, as follows:

> "The rules which define the duties of an attorney when dealing with his client are well established. The relation between an attorney and client has always been treated as one of special trust and confidence; and for that reason the law requires that the conduct of an attorney, when dealing with his client, shall be characterized by fairness, honesty and good faith. Indeed, so strict is the injunction not to take advantage of the client, that when a client challenges the fairness of a contract made

with his attorney the latter has the burden of showing not only that he used no undue influence, but also that he gave to his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been if the latter had dealt with a stranger. * * *"

The amplification of the foregoing in the dissenting opinion by Mr. Justice BENNETT in the same case is particularly appropriate in the case at bar.

"These are brave, strong words, and with every syllable of them I entirely concur. They fix the duty of an attorney toward his client at a high standard—but not too high, when we consider the peculiarly confidential relation which an attorney enjoys; and the fact, that those with whom he deals, are oftentimes helpless from infancy or old age, and are generally ignorant of the law, and of their legal rights; and practically at the mercy of the lawyer who represents them. Such a declaration of the principles which govern attorneys, will be an inspiration to the lawyer who cares deeply for his profession and for its honor."

The foregoing statements were quoted with approval in the later case of *In re Lobb's Will,* 177 Or 162, 189, 160 P2d 295.

This court has uniformly held that it is the duty of a beneficiary who participates in the preparation of a will and who occupies a confidential or fiduciary relationship to the testator to see that the testator receives independent and disinterested advice. See *In re Rupert's Estate,* 152 Or 649, 54 P2d 274; *In re Brown's Estate,* 165 Or 575, 103 P2d 775; *In re Lobb's Will,* supra. The same rule has been applied to a donee who occupies a confidential or fiduciary relationship to the donor and who participates in the con-

summation of the gift. See *Ramstead v. Bridges,* 175 Or 182, 190, 152 P2d 306; *Gilliam v. Schoen,* 176 Or 356, 157 P2d 682. As pointed out in *In re Lobb's Will,* supra, the foregoing rule applies with especial force where the beneficiary or donee is an attorney representing the testator or donor. See, also, *In re Brown's Estate,* supra.

■ Mrs. Hollander's mental condition was well known to Mr. Moore as clearly evidenced by his solicitous interest in her welfare. When Mrs. Hollander told Moore that she wanted to deed her home to him, it was his duty as her attorney and trusted friend to insist that she procure independent advice. Under the circumstances existing in this case, his failure to do so is in itself sufficient to render the deed void. See *Gilliam v. Schoen* and *In re Lobb's Will,* both supra.

Any competent, disinterested advisor would have pointed out to Mrs. Hollander the folly of divesting herself during her lifetime of the ownership and control of her modest home and comparatively meager resources. He would have repeated, in substance, the advice given in ancient times by the son of Sirach, as reported in the Aprocrypha, Ecclesiasticus, ch 33, 19-23,[1] and would, if possible, have persuaded her not to convey her home to the defendants. If, as the evidence indicates, Mrs. Hollander was unable to look

---

[1]
19. Give not thy son and wife, thy brother and friend, power over thee while thou livest, and give not thy goods to another; lest it repent thee, and thou intreat for the same again.

20. As long as thou livest and has breath in thee, give not thyself over to any.

21. For better it is that thy children should seek to thee, than that thou shouldest stand to their courtesy.

22. In all thy works keep to thyself the preeminence; leave not a stain in thine honour.

23. At the time when thou shalt end thy days, and finish thy life, distribute thine inheritance.

after her own affairs, he would have advised the appointment of a guardian or conservator.

It is obvious that the two secretaries employed in Mr. Moore's office were not in a position to give Mrs. Hollander disinterested and independent advice. See *In re Lobb's Will,* supra.

■ An oft quoted rule applying in cases of this kind is stated in *Jenkins v. Jenkins,* 66 Or 12, 17, 132 P 542, as follows:

> "A gift obtained by any person standing in a confidential relation to the donor is prima facie void, and the burden is thrown upon the donee to establish to the satisfaction of the court that it was the free, voluntary, unbiased act of the donor. A court of equity, on the grounds of public policy, watches such transactions with a jealous scrutiny, and to set them aside it is not necessary to aver or prove actual fraud, or that there was such a degree of infirmity or imbecility of mind in the donor as amounts to legal incapacity to make a will or execute a valid deed or contract. * * *"

The foregoing rule has been applied in the following cases: *In re Rupert's Estate,* supra; *Bliss v. Bahr,* 161 Or 79, 87 P2d 219; *In re Brown's Estate,* supra; *Ramstead v. Bridges,* supra; *Gilliam v. Schoen,* supra; and *Legler et al v. Legler,* 187 Or 273, 211 P2d 233.

■ The rule regarding the burden of proof where a fiduciary relationship exists between the donor and donee is concisely stated in *Evans et al. v. Anderson,* 186 Or 443, 470, 207 P2d 165, as follows:

> "Ordinarily, the burden of proving undue influence rests upon the party alleging it. However, where a fiduciary relationship exists between donor and donee, there is a presumption of undue influence and the donee is required to produce evidence sufficient to establish that the gift was the free and voluntary act of the donor and that the trans-

action was fair and equitable. Gilliam v. Schoen, 176 Or. 356, 363, 157 P. (2d) 682, and authorities therein cited. * * *"

In this case the defendant has failed to overcome the presumption of undue influence resulting from his relationship with Mrs. Hollander. The deed executed by Mrs. Hollander conveying her home to the defendant should be cancelled. The defendants have not appealed and that portion of the decree setting aside the alleged gift of the bank account and household furnishings, which we think was eminently proper, needs no other comment here.

■ Defendants relied heavily on the testimony of Mr. Arthur H. Lewis to the effect that Mrs. Hollander was competent when she executed her will on October 19, 1953, and understood the nature and effect of that instrument. The validity of that will is not here involved and we express no opinion with regard thereto. It is well settled, however, that proof of a higher degree of mental capacity is required to sustain the validity of a deed than to sustain the validity of a will. See *Gilliam v. Schoen,* supra; *Miller et al. v. Jeffery et al.,* 129 Or 674, 278 P 946; *Legler et al. v. Legler,* supra; and *First Christian Church v. McReynolds,* 194 Or 68, 72, 241 P2d 135. Mrs. Hollander may have understood that she was executing a deed conveying her home to the defendants but we are satisfied that she had no understanding of the legal or practical consequences of that improvident act.

The decree of the circuit court will be modified to provide for the cancellation of the deed executed by Hulda Hollander on October 28, 1953, conveying her home to the defendants, and to provide that the plaintiff shall recover his costs in the trial court. Since

the judgment against defendants included interest earned by Mrs. Hollander's money while deposited in the account of the defendants, we believe that portion of the decree should not be disturbed. As herein modified, the decree is affirmed. The plaintiff is allowed his costs in this court.