Submitted July 15, suspended October 30, 1959

In re Complaint as to the Conduct of
## FLOYD D. MOORE, Accused
345 P. 2d 411

No appearances.

PER CURIAM.

This matter comes before us in regular course to review the findings and recommendations of the Board of Governors of the Oregon Bar respecting charges of professional misconduct made against Floyd D. Moore, an attorney licensed to practice in the courts of this state.

On February 5, 1959, the Oregon Bar filed a complaint containing four charges, as follows:

The First alleges that on or about October 19, 1953, while the accused was acting as attorney at law and counselor for his client Hulda Hollander, she executed

a last will and testament, prepared by the accused, in which she left to him all of her property, with the exception of her piano, which was bequeathed to her church; that at that time Mrs. Hollander was suffering from a condition of senile dementia and was incompetent to conduct her own business affairs and that such condition of senility and incompetence was well known to the accused; that on and prior to the execution of the will the accused at no time advised his client to seek independent advice regarding its execution; and that the aforesaid conduct of the accused was and is unethical and in violation of the rules of professional conduct made and promulgated by the Oregon State Bar and constitutes such conduct that, if the accused were now applying for admission to the Oregon State Bar, his application should be denied.

The allegations of the Second are: That on or about October 28, 1953, said Hulda Hollander, while a client of the accused, executed and delivered to him a bargain and sale deed, conveying to him her home, located in Portland, but wherein she reserved a life interest.

The Third Charge alleges: That on or about November 2, 1953, while the accused was acting as attorney at law and counselor for Mrs. Hulda Hollander, a savings account of $5,342.10, owned solely by said client, was changed to a joint account with the accused; that thereafter, on or about November 19, 1953, the amount of $5,000 was withdrawn from said joint account and deposited in the Rose City Branch of The First National Bank of Portland, Oregon, in an account belonging solely to Mrs. Hollander; and that on the same date said account was changed to a joint account with the accused; and, also, on the same day the accused was furnished by said client with a key and

joint access to her safety-deposit box; that thereafter, on or about January 25, 1954, the account in the Oregon Mutual Savings Bank of Portland, Oregon, was closed and the balance therein transferred to the aforesaid joint account in the Rose City Branch of The First National Bank; and that thereafter, on August 16, 1954, the accused withdrew from the joint account in the Rose City Branch the amount of $5,006.03 and deposited the same in a savings account which the accused maintained jointly with his wife in another bank.

The Second and Third charges also included the same allegations as incorporated in the first charge respecting the accused's knowledge of Mrs. Hollander's mental condition and the same allegations with reference to the unethical character and violation of the rules of professional conduct.

The Fourth and last Charge was to the effect that on or about December 24, 1957, the accused wilfully sought to mislead Judge William Dickson, Judge of the Circuit Court of the State of Oregon, for the County of Multnomah, Probate Division, by offering for probate the will dated October 19, 1953 (the will referred to in the First Charge, supra), by falsely representing to said judge that said will was her last will and testament, when he had knowledge of the existence of a later will, dated March 10, 1956.[1]

After the issues were joined by the accused's answer to the Bar's complaint, a hearing was had on April 10, 1959, before a Trial Committee of the Bar, where the accused appeared in person and by his attorney. There was no controversy that the documents referred to in

---

[1] The will of March 10, 1956, was drawn by attorney Opsund after Mrs. Hollander had been paroled from the Eastern Oregon State Hospital to the custody of Mr. and Mrs. Hans Sater. Mrs. Hollander died December 22, 1957, at the home of the Saters.

the First and Second Charges were executed by Mrs. Hollander at the times as in the complaint alleged, nor that various transactions were had with respect to Mrs. Hollander's savings accounts at the times and in the amounts set forth in the Third Charge.

On June 12, 1959, the Trial Committee found the accused guilty on the First, Second and Third Charges, as alleged in the complaint of the Oregon State Bar, except that they specially found him not guilty of knowledge that Hulda Hollander was suffering from senile dementia at the time of the several transactions referred to in those three charges. They also found him not guilty on the Fourth Charge.

The findings of the Trial Committee and its recommendations for discipline were in due course referred to the Board of Governors of the State Bar for review and considered by that body at its meeting on June 27, 1959 (11 members participating and one member absent). After its consideration of the record now before us and by a vote of 10 to 1, it rejected the first three findings of guilt and adopted as its own a finding of "not guilty" on the Fourth Charge. By a vote of all 11 members present, it made a recommendation to this court that the accused be not disciplined in any manner by this court.

Before proceeding further, we take note that Mrs. Hollander, on August 7, 1954, left Portland by train for Duluth, Minnesota (near her former home), to visit relatives. On or about August ninth or tenth following, a nephew of Mrs. Hollander called Mr. Moore to advise that Mrs. Hollander had suffered a complete mental collapse and was then confined in a hospital of that city. The nephew requested Mr. Moore to come and get her and return her to Portland. This

Mr. Moore claims was his first information that Mrs. Hollander was mentally ill.

Mr. Moore responded to the call by plane and returned with Mrs. Hollander by train sometime prior to August 15, 1954, when he immediately arranged for her hospitalization at the Fairlawn Home, in Portland. On August fifteenth she was there examined at the instance of Moore by Dr. James G. Shanklin, of the medical firm of Dixon, Dickel & Shanklin, distinguished psychiatrists of that city. On Dr. Shanklin's recommendation, Moore signed a notice of mental illness on August seventeenth, resulting in Mrs. Hollander's commitment to the Eastern Oregon Hospital on August twenty-fourth. But before doing so, indeed, on August sixteenth, after receiving the report of Dr. Shanklin's examination, and before her commitment or proceeding for appointment of a guardian, Moore withdrew all moneys of Mrs. Hollander from the joint savings account in the Rose City Branch of The First National Bank and deposited them in the Sellwood Branch of the same bank in a joint account to the credit of himself and wife.

On August twenty-sixth he petitioned the circuit court for the appointment of himself as Mrs. Hollander's guardian. This petition was resisted by a number of friends and neighbors of Mrs. Hollander and resulted in the appointment of one Hans Sater as guardian. Sater, on December 29, 1954, in his representative capacity, brought suit against the accused and his wife for an accounting as to all personal property received by them from Mrs. Hollander and for decree setting aside the deed of October 28, 1953 (see Charges Two and Three, supra). The circuit court gave judgment against the Moores as to all the personal property but declined to set the deed aside,

whereupon Mrs. Hollander's representative appealed. The Moores, however, did not cross-appeal as to the adverse judgment respecting the accounting for the personal property. This court set aside the deed (see *Toomey v. Moore,* 213 Or 422, 325 P2d 805, decided May 21, 1958).②

As a result of *Toomey v. Moore,* supra, the accused and wife were divested of all claim to any real or personal property received by either of them from Mrs. Hollander during her lifetime.

We have carefully reviewed the testimony consisting of 286 pages and the 24 exhibits which were offered and admitted at the hearing before the Trial Committee.

The statement of the facts found in the Toomey case, supra (pp 424 to 429, incl.), might well be adopted as a like statement in this matter, inasmuch as the record in the instant proceeding supports every element of fact there recited, with but one exception. At page 429 we said:

"Although the degree of her senility can not be stated with exactness, there was substantial, competent and convincing evidence that Mrs. Hollander during the period material to this case was suffering from senile dementia. This senility was noticeable long before the deed in question was executed on October 28, 1953 and culminated in the commitment of Mrs. Hollander to the mental hospital in August, 1954. This evidence was given by disinterested friends and neighbors and by Dr. Henry H. Dixon, an eminent physician and psychiatrist."

Instead of Dr. Henry H. Dixon, we would substitute for the purpose of this opinion the name of

② After Mrs. Hollander's death, on December 22, 1957, R. J. Toomey, as administrator c.t.a. of her estate, was substituted for Hans Sater, as Guardian, in *Toomey v. Moore,* supra.

Dr. James G. Shanklin, his partner. At the trial in the Toomey case, Dr. Dixon was called as a witness because of Dr. Shanklin's then absence from the state. Dr. Dixon testified only as an expert in response to hypothetical questions, whereas, at the hearing before the Trial Committee, Dr. Shanklin's evidence was even more persuasive by reason of having made a personal examination of Mrs. Hollander a few days before her commitment to the State Hospital.

> In Toomey, supra, we also said, at p 434:
> "* * * It is well settled, however, that proof of a higher degree of mental capacity is required to sustain the validity of a deed than to sustain the validity of a will. See *Gilliam v. Schoen,* supra; *Miller et al. v. Jeffery et al.,* 129 Or 674, 278 P 946; *Legler et al. v. Legler,* supra; and *First Christian Church v. McReynolds,* 194 Or 68, 72, 241 P2d 135. Mrs. Hollander may have understood that she was executing a deed conveying her home to the defendants but we are satisfied that she had no understanding of the legal or practical consequences of that improvident act."

The same observation is equally applicable here.

The relationship between Moore and Mrs. Hollander was exceptionally close and confidential, particularly during the years 1953 and 1954, marked with frequent meetings, both within and without his office. His very solicitous interest in her welfare, revealed by many activities and services in her behalf were of a character usually accorded to one suffering from physical or mental disabilities associated with age. The record in that respect in Toomey, supra, moved us to say, as does the record here: "Mrs. Hollander's mental condition was well known to Mr. Moore as clearly evidenced by his solicitous interest in her welfare." (213 Or at 432).

On the three separate charges that the accused at no time advised his client to seek independent advice regarding her proposal to make him her sole beneficiary under her will, her proposal to deed him all of her property and her proposal to make him a joint depositor with herself as to her only liquid assets, we find that his testimony alone is to the effect that he did so advise her, except with reference to Mrs. Hollander's proposal that he become a joint depositor with her. He did, however, make what we conceive to be feeble, if not insincere, gestures to circumvent this necessity for independent advice by having his secretary draw the will of October tenth and then take it and Mrs. Hollander to Mr. Arthur Lewis, one of the two attorneys co-sharing offices. But as to the matter of the preparation of the deed of October twenty-eighth and the transfer of the savings account to a joint account, no effort was made by Moore to first bring Mrs. Hollander in contact with Mr. Lewis or Mr. Samuel Weinstein, the other co-sharer of the suite, which they occupied with Mr. Moore, and both of whom are well and favorably known as members of the Oregon Bar. Nor is there evidence that Mrs. Hollander was encouraged to make any other legal contacts before signing the deed or changing her deposit. The deed, we should add, was drawn by the two office secretaries in collaboration, using materials furnished by Mr. Moore as an aid and guide in so doing.

Mr. Moore's relationship to Mrs. Hollander was far more intimate and of more frequent association than was that of Mr. Wilson to his client, Mrs. Lobb, for whom he had a will drawn by an office associate. See *In re Lobb's Will,* 177 Or 162, 160 P2d 295, and *In re Lobb's Will,* 173 Or 414, 145 P2d 808. What

we denounced in the Lobb case as professional impropriety we can more easily and more forcefully condemn in the instant matter.

Moore's explanation for the quick transfer of the joint deposit account of over $5,000 to another depository and the opening as a joint account in the name of himself and wife the day after he learned from Dr. Shanklin that Mrs. Hollander should be committed to a state hospital was equivocal and evasive. His reasons therefor are far from convincing, claiming that he was the legal owner with only a "moral" obligation to disburse it for Mrs. Hollander's benefit. He gave as one of the reasons in making the transfer that he had anticipated "I might have a little trouble with the parties Mrs. Hollander had mentioned."

We note, too, that in this petition to the probate court for appointment as Mrs. Hollander's guardian, made ten days after the transfer of the savings account, he makes no reference to the money deposited, but, to the contrary, represents the value of all her personal property as of "the probable value of $500." See *State v. Gralewski's Estate,* 176 Or 448, 457, 159 P2d 211, on the matter of the transfers of joint-deposit accounts in the manner attempted by Mr. Moore.

Whether or not Mr. Moore was fully aware, as were some of Mrs. Hollander's friends and neighbors, of her mental deterioration in the month of October, 1953, her changeability and persistence in wanting to vest him with the ownership of substantially all she owned should have been a warning signal to one who not only claimed to be her closest and best friend, but her attorney as well. "Any competent, disinterested adviser would have pointed out to Mrs. Hollander the folly of divesting herself during her lifetime of the ownership and control of her modest home and com-

paratively meager resources * * *. If, as the evidence indicates, Mrs. Hollander was unable to look after her own affairs, he would have advised the appointment of a guardian or conservator." (Toomey, supra, at 432) To the contrary, Moore not only accepted her gifts, but evidenced an unusual alacrity in implementing her ill-advised wishes to endow him with her small estate. In less than 20 days he was in complete ownership or control of all that she owned except the furnishings in her home.

It is our conclusion that the accused is guilty as charged in the First, Second and Third Charges and not guilty under the Fourth Charge.

It is, therefore, ordered that Floyd D. Moore be suspended from the practice of law for a period of one year from this date.