Argued March 17, affirmed April 6, 1960

ELKIN ET AL *v.* WRIGHT ET UX

350 P. 2d 906

*William M. Keller* argued the cause for appellants. On the briefs were Philip A. Levin and Keller & Keller, Portland.

*Robert L. Dressler* argued the cause for respondents. On the brief were Buhlinger & Dressler, Portland.

Before McAllister, Chief Justice, and Perry, O'Connell and Duncan, Justices.

DUNCAN, J. (Pro Tempore)

Appeal from a decree in equity entered July 28, 1958, in the circuit court of Multnomah county decreeing Mae Blossom Wright to be owner in fee of "Lot Fourteen (14), Block Seventy-five (75), SELL-WOOD, City of Portland, County of Multnomah and

State of Oregon" and quieting title in her. For convenience that defendant will hereafter be referred to as Mae and her husband George Wright as George.

Franklin H. Smith died intestate in Multnomah county November 16, 1955. His sole heirs at law were two daughters, Zoe M. Elkin, one of the plaintiffs, and defendant Mae. For convenience Zoe M. Elkin will be referred to as Zoe, and the father of the girls, as deceased.

On August 31, 1955, deceased executed a deed in warranty form conveying the above real property to Mae. This deed was not recorded until November 16, 1955, a few hours following the death.

Plaintiffs' amended complaint, filed August 28, 1957, alleged deceased to have been mentally incompetent to execute the deed on August 31, 1955, and that Mae used undue influence to secure the signature of deceased thereon.

Plaintiffs also allege lack of delivery of the deed by deceased to Mae.

By their answer defendants deny the charges in the amended complaint and cross-complain, alleging an agreement between defendants and deceased, whereby defendants agreed to reside with and care for deceased and improve his property, in return for which Mae would receive the property. Defendants allege performance on their part of this agreement.

The decree held valid the above deed of deceased to Mae and held her to be owner in fee of the property and quieted title in her.

On appeal plaintiffs assign error (1) in failing to find that deceased was mentally incompetent to execute the deed on August 31, 1955, and (2) in failing

to find that deceased had been subject to undue influence of the grantee in executing that deed.

■ The rule is well established that where a gift is made to one standing in a fiduciary or confidential relationship to the donor, there is a presumption of undue influence and the donee is required to produce evidence to establish that the gift was the free and voluntary act of donor, and that the transaction was fair and equitable. *Toomey v. Moore,* 213 Or 422, 325 P2d 805.

The same burden, at least in a case of real mental weakness, is cast upon defendants to have shown the capacity of deceased to make the deed. *Miller et al. v. Jeffery et al.,* 129 Or 674, 685, 278 P 946.

Decedent's wife died in July, 1952. He lived with defendants in their home commencing in late 1952 or early 1953. According to Mae's testimony, defendants put their house up for sale so they could get a larger house; that deceased objected to this and wanted defendants to move into his house, saying: "You know that house over there is yours anyway, will be some day." Mae said decedent told her to take care of what had to be done to his house. Defendant George testified to an agreement between defendants and deceased concerning the latter's house as follows:

"Q (By Mr. Buhlinger) Did you at any time discuss with Franklin Smith an agreement concerning those improvements?

"A Yes.

"Q And what was that agreement?

"A Well, the agreement was that we were to fix the house, to put the house in livable condition. We would do so ourselves and take care of him, and he would live with us and the house would go to Mae.

"Q Now can you describe the improvements that you made?

"A Yes.

"Q Could you tell the Court what improvements were made to the house as nearly as you can remember?

"A Installed a new furnace.

"Q What was the condition of the existing furnace before the new one was installed?

"A It was in very poor condition. It was of an old type furnace, wood furnace, and the top of the drum was caved in.

"Q All right. You may proceed with any other improvements.

"A And I refinished the floors in the living room and the dining room, new linoleum in the kitchen and bathroom, and we papered and painted the living room and the dining room, the kitchen, the nook, the hallway upstairs and down, and the stairway, and there was rewiring that was necessary; installed a new hot water heater which was necessary, and as I said, necessary wiring had to be done. There was plumbing. I installed a new washbasin and toilet in the bathroom, and other plumbing repairs that were necessary, and there was numerous other smaller details that I had done.

"Q What about the yard, was that in good or bad condition at the time you commenced making the improvements?

"A The yard was not in good condition.

"Q Now do you recall in terms of cash outlay what these improvements cost?

"A Approximately $2000.

"Q Now that was cash that was spent by you, is that right?

"A That is correct.

"Q  Now did you perform services yourself in the repair of the house?

"A  Definitely, yes.

"Q  Did you do papering and painting?

"A  I did painting in the bathroom. I installed the linoleum on the floor in the bathroom and I put the wall tiling in the bathroom.

"Q  Then is it true that the cost that you mention in terms of cash outlay in some instances would cover only materials?

"A  Well, materials and labor, which the contractors I had hired to do—would include their labor."

This testimony was undisputed. Defendants and deceased moved into the latter's house in August, 1954. The mental competence of deceased was unquestioned during the foregoing period.

Deceased and Mae carried his money in a joint checking account from the middle of 1953. She testified that it was placed jointly at the bank's request because the signature of decedent was becoming very shaky and illegible. A savings account was also placed in their joint names by deceased. Mae attended to substantially all the business of the deceased.

Zoe's husband, Edwin, testified that he talked with deceased in August, 1952, and the latter said he intended to divide his property evenly between Mae and Zoe.

Zoe was in Portland between April 28 and July 16, 1955, and testified that deceased was then mentally incompetent; that following surgery and while he was having a lucid interval deceased said to her: "Well, I guess the only thing to do is divide everything evenly." Zoe further testified that about that time Mae told her that the signature of deceased was worth-

less. Zoe's husband Edwin testified that during that period deceased was more or less like a child and could understand only when conversation was repeated over and over. There is in evidence a letter dated August 25, 1955, from Mae to Zoe which tells of deceased's partial paralysis, of his incontinence and general poor physical condition and also stated that "His mental condition is really a problem."

Deceased was in the Veterans' Hospital from July 10 to August 16, 1955, and then returned to live with defendants in the house of deceased. From then to his death his physical condition was bad, and he was mentally disturbed, particularly at night.

William Wright, father of George and a long-time acquaintance of deceased, testified that he visited the latter between August and November, 1955, and that he was then very bright; that deceased told him that he had to get busy and deed the property to Mae, as she had two daughters and that he wanted to keep it in the family. This witness said that deceased was then competent.

Patience Smith, cousin of Mae and Zoe, visited deceased in August and September, 1955, and stated that he knew her and her daughter and that he discussed the World's Series. She believed he could transact business.

Edward Craig, brother-in-law of deceased and an acquaintance of 50 years, visited deceased in August and September, 1955. He testified that deceased knew what he was doing and that he was capable of making decisions. This witness did not believe that anyone could have exerted undue influence over deceased.

Richard Applegate, an acquaintance of deceased from boyhood, visited him in the forepart of Septem-

ber, 1955. He found deceased physically alert and talking coherently.

Dr. Gourley, ward physician at the Veterans' Hospital, had no recollection of deceased or his trouble. He examined the hospital record and, based thereon, thought that deceased was incompetent to handle his business affairs between July 10 and August 16, 1955. The witness said that the indicated condition was such as fluctuated between orientation and disorientation and was usually worse at night.

Dr. McDaniels had never seen deceased and testified only hypothetically from reading the hospital record and from reading a letter from Mae to Zoe. He thought deceased was not competent to transact business between July 10 and August 16, 1955, and that it would be unusual for deceased to have recovered sufficiently to do business in one week's time thereafter. He said it might be possible that deceased was in a lucid interval when he signed the deed.

Mae testified that about August 21, 1955, Dr. Underwood, at her request, visited deceased to check his physical condition. She said that deceased was then alert and remained so thereafter. This was the only visit made by Dr. Underwood, and he was not called to testify.

Mae testified that on about August 28 or 29, 1955, the matter of the deed came up. The questions and answers by her were as follows:

"Q  Can you tell me, Mrs. Wright, how the deed covering the Spokane Street property and which is in evidence, how that came to be executed?

"A  Yes. I was up taking care of Daddy in the morning and he was talking to me. He said, 'Now that the —' —he said the house was mine and I said, 'Oh? No arrangements—' —no permanent

arrangements had been made. And he said, 'Well, what in the world—' —he says, 'Then let's get this deed and get it straightened out. Let's get something done about it right now.' He wanted to have it done then. So that was when Mr. Wright—I told Mr. Wright what he wanted. That was in the conversation we were having in the morning. I don't even know; just the little conversations you have together.

"Q And then arrangements were made for the preparation of a deed, is that right?

"A Yes."

Pursuant thereto George requested attorney Ernest J. Buhlinger to prepare a deed. This was done, and Mr. Buhlinger suggested that they have a notary living closer to deceased than he, so Mae called Helen Boelens, also known as Bauer, a long-time friend of the family, and she came over to the house of the deceased on the evening of August 31, which was about two days after she was called. Mae testified that she then read the deed to deceased, and he said, "Well, it's fine." She testified that his eyes were bad and she gave him the pen and showed him the line, and that after it was signed and notarized she put the deed in the drawer. She said she considered the property hers but felt reluctant to record the deed while her father was still alive.

Mrs. Boelens said she made no specific inquiry as to the mental condition of deceased; that he seemed normal and mentally alert, talked coherently and that she believed him mentally competent. She said that Mae told deceased that the paper was a deed to the house. She said that he had trouble signing because of poor sight and shakiness. She said that after notarizing the deed she thought that she handed it to Mae.

■ The allegation of lack of delivery was not sustained by the evidence.

■■ The alleged agreement between deceased and defendants to deed the property to Mae in consideration of defendants promise to care for deceased and improve the property, supported by the uncontroverted evidence that defendants performed by caring for deceased and improving the house, is deemed established by the evidence. Accordingly, the deeding over of the property is not classed as a gift.

■ The competency of deceased to then have executed the deed was a question of evidence, and the trial court obviously found that deceased was then competent. The evidence, if believed, was sufficient for this finding, and the trial court was in a favored position to observe the witnesses and evaluate their testimony.

Aside from the legal conclusion reached, it is not amiss to note that Zoe and her husband, though separated by distance, were always genuinely solicitous of Zoe's father and mother and aided them with funds when needed.

The decree is affirmed.