Argued September 14, 1970, affirmed as modified March 24, 1971

ATKESON, *Appellant, v.* EVELYN E. HOLLY, *Respondent.*

482 P2d 732

*Willard Bodtker*, Albany, argued the cause for appellant. On the briefs were Long & Bodtker.

*Harrison M. Weatherford* and *Peter Powers*, Albany, argued the cause for respondent. With them on the briefs were Weatherford, Thompson, Horton & Jordan.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, and TONGUE, Justices.

McALLISTER, J.

This suit in equity was brought by the executor of the estate of Albert E. Anthony against Evelyn E. Holly, in whose home Anthony lived for the last two and one-half years of his life. Plaintiff alleges two causes of suit against Mrs. Holly. First, that between January 18, 1967, and June 6, 1967, Mrs. Holly, through the exercise of undue influence, obtained $3,950 from Mr. Anthony for which she has failed to account. Second, that between July 14, 1967 and October 17, 1967, Mrs. Holly withdrew $6,150 from Anthony's bank accounts and converted this money to her own use. Plaintiff prays for an accounting and for a judgment for the money allegedly due the estate.

The trial court found for the defendant on both causes of suit on the basis that Mrs. Holly's influence, if any, was not undue and that Anthony had authorized the disposition of the allegedly converted funds. Plaintiff appeals.

Anthony was a bachelor farmer who lived in

Benton County across the Willamette River from Albany. In February 1965 when he was 78 Anthony suffered a stroke and was hospitalized in Albany.

At the time of his stroke, Anthony lived on land which had belonged to his deceased brother Louie in a house where they had lived together during Louie's lifetime. Albert Anthony owned a 100-acre tract adjoining Louie's farm on which there was a house and related farm buildings. Anthony also owned an additional 80-acres of farmland across the road from the 100-acre tract.

In 1962 Anthony had rented the house on his 100-acre tract to defendant Evelyn E. Holly and her husband for $60 per month. Between 1962 and 1965 the Hollys occasionally saw their landlord Albert Anthony, but apparently there was no close personal or social relationship between them during that period.

While Anthony was in the hospital recovering from his stroke the Hollys visited him a number of times. By March 15, 1965, Anthony was ready to leave the hospital but had no one at home to care for him and did not want to go to a nursing home. The Hollys offered to care for Anthony in their home and he accepted their offer. They notified the plaintiff, Anthony's nephew, Howard Atkeson, of the proposed arrangement and consulted with Anthony's doctor, who gave his approval. On March 17, 1965, the Hollys took Anthony to their home where he lived until September 29, 1967, when he was hospitalized with his final illness. He died October 17, 1967.

When Anthony moved from the hospital to the Holly home he was unable to care for himself. The stroke had impaired his right arm and hand and he had to learn to feed himself with his left hand. He could not stand up without help, but once on his feet

could move around with some support. Anthony was given a bed in the living room and was cared for by the Holly family, which included three teen age children. Mr. and Mrs. Holly were both employed, but arranged their working hours so that one of them would always be at home with Anthony.

Under the Hollys' care Anthony improved so that in a few months he was able to get up and around by himself. He could move about in the house, walk out to the barn and around the yard, and go for rides with the Hollys. All of the evidence, especially the testimony of his doctor, indicates that Anthony was given excellent care.

Soon after Anthony moved in with the Hollys it was agreed that he would pay them $300 a month for his board, room and care. In addition, his social security check of about $50 a month was given to Mrs. Holly to be used for his needs. Mr. and Mrs. Holly continued to pay him rent for the house.

Anthony soon enlisted Mrs. Holly's help in handling his money. She made out his checks and other necessary papers. He could sign the checks, but it was necessary for someone to support his hand while he wrote his name. This arrangement continued until July 14, 1967, when Anthony gave Mrs. Holly a power of attorney to sign his name in connection with his bank accounts.

In December of 1965 Anthony deeded to Mr. and Mrs. Holly the house in which they were living, together with three acres of land surrounding it. The plaintiff does not challenge that conveyance nor contend that it was brought about by undue influence or impropriety on the part of the Hollys. There is, however, a slight discrepancy in the evidence about the consideration for this conveyance. Plaintiff testi-

fied that Anthony told him the place had been deeded to the Hollys, who were to care for him as long as he lived. Anthony's lawyer testified that Anthony told him in August 1966 that he had conveyed the house to the Hollys for taking care of him for the rest of his life.

Mrs. Holly agreed that in consideration for the deed Anthony was to have a home for the rest of his life, but testified that the future care did not include all of the expenses involved in taking care of Anthony. She testified that Anthony said "he would see that his own things were taken care of." After the conveyance the Hollys no longer collected $300 a month from Anthony, although, according to Mrs. Holly, he continued to pay for his own needs and supplies.

■ Turning to the first cause of suit we note that plaintiff does not itemize the $3,950 which he alleges Mrs. Holly obtained from Anthony by undue influence during the period from January 18 to June 6, 1967. It is conceded, however, that during the above period Mrs. Holly received from Anthony a total of $3,747.32 and that between June 12, and June 26, 1967, she received three additional checks totaling $1,000. We do not know why plaintiff failed to include this additional $1,000 in his first cause of suit, but will assume that it was an oversight, and will further assume that Mrs. Holly is accountable for the full sum of $4,747.32.[1] All

---

[1] A donee who is in a confidential relationship with a donor may be required to bring evidence to overcome an inference that the gift was obtained by undue influence. Geiger v. Palmer, 249 Or 123, 129, 437 P2d 750 (1968); Cline v. Larson, 234 Or 384, 409, 383 P2d 74 (1963); Elkin et al. v. Wright et ux, 221 Or 216, 219, 350 P2d 906 (1960); In re Reddaway's Estate, 214 Or 410, 420, 329 P2d 886 (1958). Our opinions in this case and in Atkeson v. Richard L. Holly et ux, decided herewith, assume that the defendants had this burden. There was clearly a confidential relationship, at least between Anthony and Mrs. Holly.

of this money was received by Mrs. Holly by cashing checks signed and given to her by Anthony, with one exception. The exception was a withdrawal from a savings account, but the withdrawal slip was also signed by Anthony.

■ We agree with the trial judge that Mrs. Holly satisfactorily accounted for the funds received during the period involved in the first cause of suit. Most of the money was used to pay for four major items of expense. At Anthony's request Mrs. Holly put $1,500 in a savings account in her own name to pay Anthony's funeral expenses and she later paid funeral expenses amounting to $1,308.50 from that account. Approximately $1,500 was expended for building supplies used in converting the back porch of the home into a bathroom and utility room. According to the Hollys this improvement was made during the spring and summer of 1967 for the special convenience of Anthony, who was then unable to climb the stairs to use the bathroom on the second floor. Mrs. Holly testified that the costs incurred in the remodeling of the back porch were paid with cash furnished by Anthony, who had her cash checks and make withdrawals from his savings account for that purpose.

According to Mrs. Holly a check for $600 dated June 26 was given to reimburse the Hollys for the expense of a vacation trip to southern California on which Anthony had accompanied them and to pay for an air conditioner for their car which had been installed during the trip at Anthony's request. Another $400 was used to pay for repairs to an old pickup belonging to Anthony which he had given to Gary, one of the Holly sons, and which had to be put in operable condition. These four major items total about $4,000

and the other approximately $700, according to Mrs. Holly, was used for medicines and supplies for Anthony, including a suit and some extra bedding required because of his occasional incontinence.

During the first half of 1967 Anthony was in full possession of his faculties and, according to all the evidence, was contented and happy to be living with the Hollys, much as a member of their family. He was writing his own checks, took a personal interest in the construction of the new bathroom, and knew what his money was being used for.

Anthony was apparently satisfied with the way Mrs. Holly was spending his money and we are not inclined to require any more specific accounting of the money received by Mrs. Holly during this period.

Turning to the second cause of suit we face a more difficult problem. In this cause of suit plaintiff alleges that on July 14, 1967, Anthony executed a power of attorney authorizing Mrs. Holly to sign checks and withdrawal orders on his bank accounts. Plaintiff further alleges that, by virtue of the power of attorney, Mrs. Holly withdrew the sum of $6,150, which she converted to her own use.

The bank records disclose that from July 14 to September 28, 1967, Mrs. Holly withdrew from Anthony's accounts, mostly by sundry checks, a total of $6,422.35. $500 of that sum was merely transferred from Anthony's checking account to a savings account, leaving $5,922.35 for which she is accountable.

■ The trial court found that Mrs. Holly had satisfactorily accounted for all of the $5,922.35. We are inclined to agree except as to a major item of $4,000 withdrawn on July 31, 1967. As to that item we think Mrs. Holly has not carried her burden of proof.

Mrs. Holly testified that Anthony authorized her to withdraw the $4,000 to reimburse the Hollys for the cost of a number of substantial repairs and improvements which had been made in 1966 to the home deeded to them by Anthony in December, 1965. The Hollys testified that all of these improvements were made at Anthony's specific request and direction and upon his promise to pay for them. There is independent evidence that, at least as to the front porch bedroom, Anthony intended to pay. The repairs and improvements included:

1. A new roof put on the house early in 1966 at a cost of about $425.

2. The conversion of the front porch into a bedroom for Anthony so that his bed could be moved from the living room, which had been the only first floor room available. This improvement cost approximately $700 and was made in the summer of 1966.

3. A new roof put on the barn at a cost of about $870, also in 1966.

4. A new pump for the household water system installed sometime in 1966 at a cost of about $300.

5. Repairs to the upstairs bathroom costing about $160, made sometime in 1966.

The above improvements made in 1966 cost a total of $2,455. In June, 1967, the entire house was rewired at a cost of about $600 and a home air conditioner was purchased for $162.35, which increased the total to $3,217.35. With the exception of the new barn roof, all of these improvements were of a kind to add to Anthony's comfort as well as to the value of the Holly property. According to Mrs. Holly, Anthony insisted that she withdraw $4,000 to cover not only the cost of $3,217.35, but also to allow something for the Hollys labor in making the improvements.

There are a number of reasons why we are not satisfied that Anthony authorized the $4,000 withdrawal as claimed by Mrs. Holly. During the 2½ years that Anthony lived with the Hollys he appeared to operate on a pay as you go policy. This was particularly true in the summer of 1967 when he was writing checks to furnish cash to buy the building materials to convert the back porch into a bathroom and utility room. There is no satisfactory explanation of why, in the case of the 1966 improvements, he would accumulate a debt of $2,500 and make no effort to pay it until July 1967.

There is a complete lack of records to substantiate the expenditures incurred by the Hollys in making the 1966 improvements. Mrs. Holly testified that Anthony instructed her to destroy all records of his financial affairs as soon as the transactions were completed. But, if the Hollys spent $2,455 of their own money in 1966 in reliance on Anthony's promise to repay them, we think they would have either detailed records of their expenditures or a clear recollection of the kind of material purchased, where purchased, and how and from what source they were paid for.

There is no evidence to indicate that the Hollys had any resources from which to pay for the 1966 improvements as they were made. If they did, we think some indication of their ability to finance those improvements would have appeared in the record.

The testimony of Gary indicates that as to the 1966 improvements, particularly the conversion of the front porch into a bedroom, Anthony supplied the money. Gary testified:

"Q  Were you around any time when any other bills were paid or anything in the house?

"A  Yeah.

"Q And how was that carried on?

"A Well, if he had a bill come in the mail or something my mom would help him sign the check or something and she would put it in the mail and send it or take it downtown where it was at and pay it.

"Q Uh-huh. Were you along when any of the materials were bought?

"A Yes, I was. I went and picked up the biggest part of them.

"Q And how did the money get transacted on those?

"A Well, Albert wrote out a check to my mother and my mom would give me the money and I would go to town and pick it up and pay for it and bring it back.

"Q And did you hear Albert Anthony talk about buying these materials or giving your mother checks for them?

"A Yes.

"Q When was that?

"A Well, when he started to fix first the front porch, he just says, well, have it fixed and you go ahead and get it and I will give you some money and we will start out with that much and when you need more I will just give it to you, write out a check."

In view of the above testimony and other circumstances, it seems probable that Anthony paid for the 1966 improvements as they were made, in the same way that he paid in 1967 for the addition of a downstairs bathroom.

It is also significant that on July 31, 1967, when the $4,000 withdrawal was made Anthony had been in the hospital for two days and had been ill at home for some days before that. His doctor testified that on July 26 he saw Anthony on a house call "and at that time I was unable to get any information from

him because he was extremely weak. Examination revealed that he was running 102 temperature and obviously had an infection and this would account for his inability to respond to questioning and not realizing what was going on." Mrs. Holly testified that Anthony instructed her to take the $4,000 a day or two before July 31st and that the conversation took place at home. It appears from Dr. Varga's testimony that at about the time this conversation is said to have taken place Anthony was very ill and could not even answer his doctor's questions.

We think the evidence about this $4,000 withdrawal is too ambiguous to support a finding in defendant's favor.

The decree of the trial court will be modified by awarding plaintiff a judgment against defendant in the sum of $4,000, together with interest from July 31, 1967, until paid, together with his costs in this court.

Except as modified the decree of the trial court is affirmed.